13 99 329   CR

RECEIVED
IN THE 13TH COURT OF APPEALS
EDINBURG OFFICE

SEP 1 3 1999

CATHY WILBURN, CLERK
BY

1

1        REPORTER'S RECORD

2        VOLUME 3 OF 5 VOLUMES

3      TRIAL COURT CAUSE NO. 96-CR-1627-B

4   - - - - - - - - - - - - - - - x
                                  :
5   THE STATE OF TEXAS            : IN THE DISTRICT COURT
                                  :
6   VS.                          : CAMERON COUNTY, TEXAS
                                  :
7   EDWARD K. LAFONTAINE, A/K/A   :
    EDWARD KENT HAUERSPERGER,     :
8   DEFENDANT                     :
                                  : 138TH JUDICIAL DISTRICT
9                                 :
    - - - - - - - - - - - - - - - x
10

11

12        MOTION TO DIQUALIFY DISTRICT ATTORNEY

13        On the 7 & 10th day of May, 1999, the

14   following proceedings came on to be heard in the

15   above-entitled and numbered cause before the Honorable

16   Robert Garza, Judge Presiding, held in Brownsville,

17   Cameron County, Texas:

18

19

20

21

22

23

24        Proceedings reported by machine shorthand.

25

          ORIGINAL

DELIVERED SEP 1 3 1999

```
 1                      A P P E A R A N C E S

 2   APPEARING FOR THE STATE:

 3        HON. JEFF STRANGE & GABRIELA GARCIA
          Assistants to the District Attorney
 4        SBOT NO. 19355650 &
          SBOT NO. 00795364
 5        Cameron County Courthouse
          974 E. Harrison
 6        Brownsville, TX  78520
          (956)  544-0849 Phone
 7        (956)  544-0869 Fax

 8   APPEARING FOR THE DEFENDANT:

 9        HON. ALFREDO PADILLA
          Attorney At Law
10        SBOT NO. 15404600
          1000 E. Van Buren
11        Brownsville, TX  78520
          (956)  544-7100
12        (956)  544-0647 Fax

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          **VOLUME 3**

2      **MOTION TO DISQUALIFY D.A.**

3  **MAY 7 & 10, 1999**                                    **PAGE**

4  Opening Statement by Mr. Padilla...................5        3

5  DEFENDANT'S WITNESSES:

                                                    VOIR
6  NAME                    DX    CX    RDX   RCX    DIRE   VOL

7  JEFF STRANGE             5    23
   GABRIELA GARCIA         16          24
8  EDWARD LAFONTAINE       25
   JOSE LUIS MATA          42    47
9  WILLIE CARDOZA          48    58
   Adjournment...................................62        3
10
   EDWARD K. LAFONTAINE    63
11 Closing Arguments by Ms. Garcia..................81        3

12 Closing Arguments by Mr. Padilla.................83        3

13 Court's Ruling...................................84        3

14 Adjournment......................................89        3

15 Court Reporter's Certificate.....................89        3

16

17

18

19

20

21

22

23

24

25

**ALPHABETICAL WITNESS INDEX**

**MAY 7 & 10, 1999**

| NAME | DX | CX | RDX | RCX | VOIR DIRE | VOL |
|------|----|----|----|----|----|----|
| CARDOZA, WILLIE | 48 | 58 | | | | 3 |
| GARCIA, GABRIELA | 16 | | 24 | | | 3 |
| LAFONTAINE, EDWARD | 25 | | | | | 3 |
| LAFONTAINE, EDWARD K. | 63 | | | | | 3 |
| MATA, JOSE LUIS | 42 | 47 | | | | 3 |
| STRANGE JEFF | 5 | | | | | 3 |
| STRANGE, JEFF | | 23 | | | | 3 |

**INDEX OF EXHIBITS**

**MAY 7 & 10, 1999**

STATE EXHIBITS:

| NO. | DESCRIPTION | OFFERED | RECEIVED | VOL |
|-----|-------------|---------|----------|-----|
| 1 | ILLINOIS JUDGMENT | 40 | 40 | 3 |

1

## INDEX OF EXHIBITS

2

### MAY 7 & 10, 1999

3   DEFENDANT EXHIBITS:

4   NO.   DESCRIPTION                   OFFERED   RECEIVED   VOL

| NO. | DESCRIPTION | OFFERED | RECEIVED | VOL |
|---|---|---|---|---|
| 1 | TRANSFER DOCUMENT | 64 | 64 | 3 |
| 2 | ARREST ENTRY FORM | 64 | 64 | 3 |
| 3 | SHERIFF'S CORRESP. | 65 | 65 | 3 |
| 4 | COUNTY FAX/AUSTIN | 66 | 66 | 3 |
| 5 | DEFENDANT'S REQUEST | 75 | 75 | 3 |

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXHIBITS

 2                   MAY 7 & 10, 1999

 3    STATE EXHIBITS:

 4    NO.   DESCRIPTION              OFFERED    RECEIVED    VOL

 5    1     ILLINOIS JUDGMENT           40         40         3

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXHIBITS

MAY 7 & 10, 1999

DEFENDANT EXHIBITS:

| NO. | DESCRIPTION | OFFERED | RECEIVED | VOL |
|-----|-------------|---------|----------|-----|
| 1 | TRANSFER DOCUMENT | 64 | 64 | 3 |
| 3 | SHERIFF'S CORRESP. | 65 | 65 | 3 |
| 4 | COUNTY FAX/AUSTIN | 66 | 66 | 3 |
| 5 | DEFENDANT'S REQUEST | 75 | 75 | 3 |

3

|     |                                                                                 |
|-----|---------------------------------------------------------------------------------|
| 1   | **VOLUME 3**                                                                    |
| 2   | **P R O C E E D I N G S**                                                       |
| 3   | THE COURT:  Let's proceed on Mr.                                                |
| 4   | LaFontaine.                                                                      |
| 5   | MR. PADILLA:  We have two motions, Your                                         |
| 6   | Honor.  The first motion is to disqualify the district                          |
| 7   | attorney.  In that respect, I would call Mr. Strange to                         |
| 8   | the stand, Your Honor.                                                          |
| 9   | THE COURT:  Mr. Strange?  Take the stand,                                       |
| 10  | please.                                                                          |
| 11  | **JEFF STRANGE,**                                                               |
| 12  | having been first duly sworn, testified as follows:                            |
| 13  | **DIRECT EXAMINATION**                                                          |
| 14  | Q.   (BY MR. PADILLA)                                                           |
| 15  | Q.   All right.  Sir, can you please state your name                           |
| 16  | for the record?                                                                 |
| 17  | A.   Jeff Strange.                                                              |
| 18  | Q.   Mr. Strange, how you employed?                                            |
| 19  | A.   I am assistant district attorney for Cameron                              |
| 20  | County, Texas.                                                                   |
| 21  | Q.   How long have you been assistant district                                 |
| 22  | attorney for Cameron County, Texas?                                             |
| 23  | A.   Since October of 1996.                                                     |
| 24  | Q.   Sir, do you have any familiarity, or are you                              |
| 25  | familiar with the case styled 96-CR-1627-B styled the                          |

4

1   State of Texas versus Edward LaFontaine?

2       A.   Yes, I am.

3       Q.   Were you the prosecutor in this case at all

4   sir?

5       A.   Not originally, no, sir.  Bill Hagen was the

6   trial lawyer.

7       Q.   When did you take over this case, if you know?

8       A.   My involvement in this case came when I came

9   into the court in, I came to this court in January of

10   1999, some time after that.

11       Q.   Okay, sir.  And were you familiar with the

12   probation status of the probationer Mr. LaFontaine as

13   early as of January, 1999, sir?

14       A.   I knew from statements, and conversations with

15   Mr. Hagen that Mr. LaFontaine was tried in March of 1997,

16   and he was placed on probation.

17       Q.   And did you from -- from -- from January 1 of

18   1999, or let's say from March of 1998, did you receive,

19   personally receive any notice of the fact that

20   Mr. LaFontaine was being held by any authorities to

21   answer to the motion to revoke?

22       A.   The first notice that I got that Mr. LaFontaine

23   was being held anywhere was some time after January of

24   1999 I was informed that he was in Dixon, Illinois and

25   that I needed to propose a governor's warrant.

5

1       Q.    Do you have Mr. LaFontaine's file with you,
2    sir?
3       A.    Yes, I do.
4       Q.    Would your file reflect when -- when your
5    offices requested either a capias or a hold on
6    Mr. LaFontaine prior to your involvement of January 19,
7    1999?
8       A.    I think my time was -- I think it would have
9    the motion to revoke or several motions to revoke
10    probation.  That would be in the Court's file.
11       Q.    All right.  Does your file -- or do you have
12    any knowledge as to what action if any was taken by the
13    department, or by your department -- by your offices --
14    prior to the information that you received to -- to
15    request the governor's warrant?
16       A.    I have no personal knowledge.
17       Q.    Okay, sir.  Who would have that knowledge at
18    your office, if anybody?
19       A.    I don't know if anybody would have been
20    pursuing defendants -- other defendants from other
21    jurisdictions.  It is the responsibility of the sheriff's
22    department.
23       Q.    Okay.  Did you have -- does the district
24    attorney's office have any type of procedure to place, or
25    implemented, to make sure that the person that

1   received -- persons that are retained in other

2   jurisdictions -- receive an adequate court hearing, sir?

3       A.   Not specifically, no.

4       Q.   This was done, am I to assume, it was done on a

5   case by case basis?

6       A.   Yes, sir.

7       Q.   Sir, is it common or uncommon for somebody to

8   remain in custody for every year prior to him being

9   brought in on a motion to revoke?

10      A.   It depends on the facts and circumstances.

11      Q.   On how many occasions, since on January of

12   1991, did you become aware of any defendant staying in

13   custody for over a year before he was convicted?

14      A.   I have no personal knowledge.  I don't keep

15   that statistics.

16      Q.   Well, do you have any knowledge at all, of

17   anybody, staying in custody for over a year, prior to a

18   hearing?

19      A.   I have no knowledge of anybody in custody other

20   than Mr. LaFontaine; and I have no knowledge that

21   actually somebody has, or hasn't.  I have no knowledge.

22      Q.   Sir, is it your department's position that the

23   district attorney's office has, you know, has done

24   nothing wrong in prosecuting this motion to revoke?

25      A.   It is my position that we have exercised all

1    due diligence that we possibly could.  Mr. LaFontaine's

2    delay was caused by his arrest on additional charges in

3    Austin, Texas, and in Dixon, Illinois.

4        Q.    Sir, have you had an opportunity to speak with

5    the people in the district attorney's office in the

6    Austin, Travis County area, to ascertain what you have

7    represented to this Court?

8        A.    I believe Ms. Garcia has.  We also have

9    information that he has a pending charge on a failure to

10   report as a sex offender.  It is my understanding from

11   the document that he has, that he was initially arrested

12   on a trespass case, and that he was sent up to Illinois

13   and I have spoken to the people in Illinois in that he

14   had a pending charge, on -- on a theft case which he was

15   sentenced to a year in probation and he was also

16   sentenced to do 180 days in jail.  And I have actually

17   seen, and have in my possession, the judgment and

18   sentence in this case.

19       Q.    But, again, "yes" or "no", have you talked to

20   anybody, yourself, personally, at Travis County

21   concerning any charges that the defendant may have had

22   against him, or any charges that the defendant may have

23   pled to in Travis County?

24       A.    I have spoken to the people at the county jail

25   warrant division.

8

1  Q. By "county jail" you mean the Cameron County

2 jail?

3  A. No, sir. The Travis county jail -- booking

4 information. Additionally the warrants people when I was

5 trying to ascertain where Mr. LaFontaine was.

6  Q. And this was done at the time that you received

7 notice on January, 1991, to secure the governor's

8 warrant?

9  A. I am not sure what date it was; it was some

10 time after January 1, 1991, Mr. Padilla, that was the

11 first time that I took. It was my understanding that he

12 was in custody, initially, in Austin, and I called Austin

13 and they told me he was up in Dixon. Illinois.

14  Q. Prior to calling January 16, 1999 did you have

15 an opportunity to review the file in the district

16 attorney's office, as to any activity that may have

17 occurred prior to January 1 of 1999?

18  A. The only time that we have, Mr. Padilla, is

19 just a motion to revoke probation and also the memos

20 submitted by the probation department. I did have that

21 in my possession but it had no relevance to

22 Mr. LaFontaine's situation.

23  Q. So you were totally unaware --

24  A. Yes, sir.

25  Q. Is there anything in your file that would

1  reflect any action from the district attorney's office

2  concerning this case, from, or let's say, March 30th,

3  1998, through January 1, 1999?

4      A.   Not in my file.  As I stated in my file it

5  contained the motion to revoke probation and the

6  memorandums from the probation department.

7      Q.   And is the district attorney's position now,

8  that they want to pursue the motion to revoke on

9  Mr. LaFontaine?

10     A.   Yes, Mr. Padilla.  It is.

11     Q.   Sir, is any of that, as a result of the fact

12 that the defendant has already been in jail for over a

13 year and this is a matter had not been previously filed

14 or set for hearing?

15     A.   My desire to pursue the motion to revoke

16 probation is based on the fact that Mr. LaFontaine was

17 found guilty of sexual assault.  He never reported to his

18 probation officer.  And, at least the allegations are

19 that he never complied with any of the conditions of his

20 probation.

21     Q.   So the fact that there has been a long delay

22 has absolutely no bearing on your decision to try this

23 case?

24     A.   No, sir.

25     Q.   Sir, is it correct that a third amended motion

1    to revoke probation on a probated sentence has been filed

2    by the district attorney?

3        A.    That was filed by myself.  Yes, sir.

4        Q.    And what other additional allegations are

5    alleged in the third amended motion that were not alleged

6    in the second one?

7        A.    The initial motions to revoke probation, the

8    first motion to revoke probation, and the additional

9    amended motion of probation incorrectly indicated that

10   the defendant pled guilty when in fact it was tried by a

11   jury.  And that's a significant change.  I was also

12   informed by yourself, I did not know of the other amended

13   motion to revoke your probation, but they had filed a

14   first amended where they did not put the failures to

15   report and I was under the erroneous belief that the only

16   allegation that we had in the motion pending before the

17   Court was just the trespass case and those are the two

18   reasons why I filed the second one.

19       Q.    And, sir, if the defendant had been brought in

20   earlier to answer to these charges, would it be correct

21   to say that a strong possibility that a lot -- or some of

22   the allegations contained in the third amended motion

23   would have been -- would not have occurred; is that

24   correct?

25       A.    Sir, I did not file any of the failures to

1   report.  I stopped filing -- there were no failures to

2   report alleged after March of 1998 when the defendant was

3   taken into custody because I know if he is taken into

4   custody he is not obligated to report to his probation

5   officer.  The motion to revoke probation just states the

6   times between the time he was on probation and the time

7   that he was arrested.

8       Q.   It is my understanding, sir, that looking at

9   the motion -- I am sure that you have something there in

10  front of you where you allege the defendant failed to

11  participate in a sexual offender program.  Is that sexual

12  offender program, is that allegation part of the

13  registration aspect of it, sir?

14      A.   I believe his condition of probation, he was

15  required by the Court to participate in the sexual

16  offenders probation, as a condition of probation.  I

17  believe the registration thing is a conditional

18  requirement required by the Code of Criminal Procedure

19  which is in addition to that.

20      Q.   Yes, sir.  As a matter of fact one of the

21  allegations that you allege is that he failed to report

22  in Cameron County; is that correct?

23      A.   Yes, sir.  He was required by the Court, absent

24  another court order to report to his probation office.

25  The motion to revoke probation specifically states as

 1   ordered by the Court, and he was ordered by the Court to

 2   report to the probation officer here.  And absent an

 3   order intervening saying that he was entitled to transfer

 4   the probation, it is my understanding of the law he was

 5   required to report here.

 6       Q.   Sir, as a matter of fact, that allegation had

 7   not been made on the previous motion to revoke that was

 8   filed; is that correct?

 9       A.   Sir, I had not seen the previous motion to

10   revoke probation which is why I erroneously indicated

11   that it was the State's amended instead of the second

12   amended, rather than the State's third amended.  It is

13   pled the way it is pled because that's the way it is

14   proper to plead allegations on a motion to revoke

15   probation.

16       Q.   What you are telling me, then, that the delay

17   in bringing Mr. LaFontaine to trial, in no way, you know,

18   changed any of the alleged violations of probation

19   conditions from the second amended to the third amended?

20       A.   The delay, if it was, it wasn't willful.  I was

21   very careful to allege allegations that occurred before

22   Mr. LaFontaine's arrest in August because it is my

23   opinion that once he's in custody, he is no longer

24   obligated to the terms of his probation.

25       Q.   Having reviewed the first amended motion, and

1    the second amended motion, and the third amended motion,

2    is it your contention, then, that all of the allegations

3    within the third motion were allegations prior -- prior

4    to, or up until the time that the defendant was taken

5    into custody in March of 1998?

6        A.    You know, I don't have the motion in front of

7    me, Mr. Padilla.  But when I drafted it, I drafted it

8    with that in mind, that the allegations in, it just

9    included the period of time that he is responsible for

10   the period of time when he received the probation up

11   until his arrest in Austin, Texas, and for the time that

12   he remained in custody.

13               MR. PADILLA:  Will the Court take judicial

14   notice of the first, second and third amended motions?

15               THE COURT:  The Court will take notice of

16   all documents in the file.

17               MR. PADILLA:  I will pass the witness,

18   Your Honor.

19               THE COURT:  All right.  Mr. Strange do you

20   have anything to say?

21               MR. STRANGE:  No, Your Honor.

22               THE COURT:  All right.  You may step down.

23               **(Witness excused at 10:30 a.m.)**

24

25               THE COURT:  Call your next witness,

1   Mr. Padilla.

2

3                   MR. PADILLA:  I call Mrs. Garcia to the

4   stand.

5                   THE COURT:  Ms. Garcia, take the stand.

6                   **GABRIELA GARCIA,**

7     having been first duly sworn, testified as follows:

8                   **DIRECT EXAMINATION**

9

10  BY MR. PADILLA:

11                  MR. PADILLA:  Your Honor, Just so the

12  record is clear, we've got two motions filed by the

13  district attorney's office and also a motion to

14  disqualify the district attorney's motions speedy trial

15  violation.  Will the Court consider both of these

16  motions, on this testimony?

17                  THE COURT:  I assuming that's what you are

18  covering, because you're asking questions on both of

19  them?

20                  MR. PADILLA:  Yes, Your Honor.  I just

21  want to make sure that the record reflects that.

22                  THE COURT:  You may proceed.

23      Q.   State your name, for the record?

24      A.   Gabriela Garcia.

25      Q.   Mrs. Garcia, how are you employed?

1      A.   I am an assistant district attorney with

2   Cameron County, Texas.

3      Q.   As a result of that employment are you assigned

4   to the 138th District Court?

5      A.   Yes, I am.

6      Q.   And that would make you partially responsible

7   or somewhat responsible for the case, styled:   State of

8   Texas versus Edward K. LaFontaine?

9      A.   Yes.

10      Q.   Ma'am, can you please tell me when you first

11   found out that Mr. LaFontaine was actually in custody?

12      A.   It must have been in or April of 1999.

13      Q.   And, how is it that you came to know that?

14      A.   I was informed by Mr. Strange that this

15   Defendant was being set for a motion to revoke.

16      Q.   Prior to that, had you, yourself, received any

17   kind of memorandum or any kind of communication from the

18   district attorney's office that would have indicated to

19   you what Mr. LaFontaine was in custody for?

20      A.   No, sir.

21      Q.   Have you had an opportunity to review

22   Mr. Edward LaFontaine's file?

23      A.   Yes.

24      Q.   Do you see anything in the file that would

25   reflect that -- that Mr. LaFontaine or -- or any

1  documentation or information from the district attorney's

2  office that would indicate that any information provided

3  to the district attorney's office showing that

4  Mr. LaFontaine was in custody?

5      A.   Just some notes that -- that he had been in --

6  he was in custody in Travis County.

7      Q.   Yeah.  And was there any dates associated with

8  the Travis County Detention, to indicate when that

9  information was derived?

10     A.   I believe so.  I would have to look in the

11 file.

12     Q.   Would it have been some time in 1998 or 1999?

13     A.   Again, I would have to look at the file.

14     Q.   Is the file there?

15     A.   Yes, sir.

16     Q.   Could you look at it, and provide it?

17              THE COURT:  Yes.  It's somewhere.

18              THE WITNESS:  Mr. Padilla the only

19 notation I see in this file that was not made by me, was

20 that on September 3, 1998, the sheriff's department, our

21 sheriff's department had traveled to Travis County to

22 pick up Mr. LaFontaine, but he was not released to --

23 to -- to our sheriff's deputies.

24     Q.   All right.  Does your file reflect any action

25 taken by the district attorney's office in an effort to

1    try to get the Travis County District Attorney's office

2    to release Mr. LaFontaine to Cameron County?

3        A.   No, sir.  This is the only notation that I see

4    in our file.

5        Q.   At that point, does your file reflect how long

6    Mr. LaFontaine has been in your custody where you

7    attempted to pick him up on September of 1998?

8        A.   No, sir.

9        Q.   Am I safe to assume that -- well, strike that.

10   Does it appear from your file, ma'am, that

11   Mr. la Fontaine has been in custody, at least, prior to

12   September of 1998?

13       A.   Again, sir, the only notation in this file is

14   that on September 3, 1998, the sheriff's office -- our

15   sheriff's office -- went to pick him up.  It does not

16   indicate how long he had been in custody.

17       Q.   Am I safe to assume, ma'am, that from the

18   date -- from that date, where you attempted to pick up

19   the defendant until now -- what date in September was

20   that, ma'am?

21       A.   September 3, 1999.

22       Q.   -- that more than 180 days have elapsed since

23   the department, since -- since the district attorney's

24   office knew that the defendant was in custody in Travis

25   County; is that correct?