1    A.    Could you please ask your question, again?

2    Q.    Yes.  On September 3, now, more than 180 days

3    have elapsed, is that true, or not true?

4    A.    Yes.

5    Q.    And does your file reflect any effort to locate

6    the whereabouts of the defendant anywhere from -- from

7    September 2, 1998, through March of 1999?

8    A.    No, sir.  The only notations that are in this

9    file have been made by me but I don't see any other

10   notations from any other prosecutor.

11   Q.    Other than the district attorney assigned to

12   handle this case for the 138th, anybody else in the

13   district attorney's office responsible for monitoring the

14   cases to identify the defendants that were in custody

15   that may necessitate a hearing?

16   A.    Well, besides the probation office, and also

17   the court personnel.

18   Q.    Anybody, specifically, in the district

19   attorney's office assigned to review the cases, on a case

20   by case basis?

21   A.    Could you be more specific, sir?

22   Q.    Yes.  My question is this:  Is there anybody in

23   the district attorney assigned to handle cases like this

24   where they are specifically assigned to ensure that if

25   somebody is in custody that that case is fast tracked for

the purpose of conducting hearings?

A.    Well, the prosecutor that would be assigned to that court.

Q.    And if that prosecutor does not have personal knowledge that the defendant is in custody, that would be impossible for that officer, or that district attorney, to act on that case; isn't that correct?

A.    Yes, sir.  Not until we are advised by the court or the sheriff's office that the defendant is in custody can we do anything about it.

Q.    But as of September 22 of last year you all knew that Mr. LaFontaine was in custody?

A.    Yes, sir.

Q.    Okay.  What -- what avenues would have been able for the district attorney office to expedite the transfer of Mr. LaFontaine to Cameron County for the purpose of conducting a hearing?

A.    Well, the avenues that are available were utilized in September of 1999, and that is, that the sheriff's office went to pick him up at Travis County.

Q.    Did you -- was there an inquiry made?  Does your file reflect any inquiry as to the court or anybody else within your department in an effort to learn or to ascertain what needed to be done to bring the defendant to Cameron County?

1      Was there anything in your file reflecting

2  that anybody took the initiative to check the file or

3  made any effort to bring the defendant here -- after

4  September of 1998, or shortly thereafter?

5      A.    Well, it is my understanding that after

6  September of 1998, this defendant was transferred to

7  another county.  So there was nothing we could do about

8  it.

9      Q.    But when did the district attorney's office

10  learn that he had been transferred to another county?

11  Wasn't it until after he was brought to Cameron County?

12      A.    I learned that after he was brought to Cameron

13  County.  I don't know if anybody else in the district

14  attorney's office was aware that he had been transferred

15  to another county.

16      Q.    So it's safe to assume the fact that he was

17  transferred to -- out of state -- had no bearing on the

18  fact that the district attorney's office made no effort

19  to locate his whereabouts until he was released and

20  brought down by a governor's warrant; is that correct?

21      A.    I don't know, Mr. Padilla.  I think an effort

22  was made because bench warrants were issued from this

23  court.  Unfortunately, this defendant was not turned over

24  to our county.

25      Q.    But a governor's warrant was filed -- is that

1   correct -- expeditiously, in fact, from the state of

2   Illinois or Indiana, or the two?

3       A.   I just learned that through the testimony of

4   Mr. Strange.

5       Q.   But your file doesn't reflect any activity --

6   at least any documented activity -- from the district

7   attorney's office, from September 2, 1998 date to the

8   time that the governor's warrant was perfected; is that

9   correct --

10              MR. STRANGE:   Objection, Your Honor.   It

11  has been asked and answered.

12              THE COURT:   It has; it will be sustained.

13              MR. PADILLA:   I pass the witness.

14                    **CROSS-EXAMINATION**

15

16      Q.   (BY MR. STRANGE)   Have you had any

17  conversations with any of the people in Travis County

18  regarding Mr. LaFontaine?

19      A.   Yes, I have.

20      Q.   Is it your understanding that Mr. LaFontaine in

21  fact has criminal charges pending in Travis County?

22      A.   Yes, he did have pending charges.

23      Q.   Are charges still pending, or do you know?

24      A.   I don't think he has any more charges pending.

25  But I am not sure whether he still has any pending

1  charges or not.  Last time I spoke with him, apparently,

2  whatever he had pending, had been resolved.  But ever

3  since then, I don't know if he has any more pending

4  charges.

5          MR. STRANGE:  That's all I have, Your

6  Honor.

7

8                    **REDIRECT EXAMINATION**

9

10     Q.   (BY MR. PADILLA)  Ms. Garcia, irrespective of

11 whether he had charges pending or not, your department

12 from the district attorney's office took no action

13 concerning locating or identifying what charges, if any,

14 the defendant had against him -- is that right -- in

15 Travis County?

16     A.   Well, I took action to find out if he had

17 anything pending at the time that I called --

18     Q.   Okay.

19     A.   -- and I did speak to the prosecutor in Travis

20 County.

21     Q.   But at this point, you have not testified that

22 you know what, if any, charges Mr. LaFontaine has pending

23 in Travis County, is that correct?

24     A.   From the last conversation that I had with the

25 prosecutor in Travis County, no, sir, I cannot tell you.

1          MR. PADILLA:  I have no further questions.

2          MR. STRANGE:  I have no further questions.

3          **(Witness excused at 10:45 a.m.)**

4          MR. PADILLA:  Judge, I call

5    Mr. LaFontaine.  We need about a two minute break for

6    medication.

7          THE COURT:  Go ahead.

8          **(Recess from 10:45 a.m. to 11:00 a.m.)**

9          **(Discussion off the record)**

10          **EDWARD K. LAFONTAINE,**

11    having been first duly sworn, testified as follows:

12                **DIRECT EXAMINATION**

13

14

15          THE COURT:  All right.  You can be seated.

16    We will wait for your lawyer to get here in a second.

17    Q.   (BY MR. PADILLA)  Could you please state your name

18    for the record?

19          A.   Edward Kent LaFontaine, also known as Edward

20    LaFontaine Hauersperger.

21          Q.   Mr. LaFontaine, are you the same Edward K.

22    LaFontaine that's on probation in Cause of Action No.

23    96-CR-1627-B?

24          A.   Yes, sir.

25          Q.   And Mr LaFontaine, can you tell the Court how

1  long you have been in continuous custody, since your last

2  arrest?

3       A.   May 30, was the last time I was arrested.

4       Q.   All right, sir?

5                 THE COURT:  What year?

6                 THE WITNESS:  1998.

7                 THE COURT:  All right.

8  Q.   (BY MR. PADILLA)  And, where were you arrested?

9       A.   I was arrested in Austin, Texas, on San Antonio

10  Street.

11       Q.   Okay, sir.

12       A.   Approximately, 3:30 p.m.

13       Q.   Okay, sir.  My understanding, was, it was a

14  criminal trespass or what kind of offense are we talking

15  about?

16       A.   No, sir.  At that time, I was arrested for a

17  warrant from Cameron County for probation violation.

18       Q.   Okay, sir.  And after you were arrested where

19  were you detained and where were you held, sir?

20       A.   I was held at the Travis county jail for

21  Cameron County.

22       Q.   At that point did you have any other warrants

23  or holds that you knew of?

24       A.   No, sir.  Shortly after Travis County put a

25  charge on me for failure to register for having resided

1    there for quite some time without registering in the sex

2    offender program.

3        Q.   Did you receive any knowledge or did you become

4    aware that since your arrest in May, 1998, that it was

5    the district attorney's office that went there, or

6    anybody from the district attorney's office from Cameron

7    County went down there to retrieve you and take you back

8    to Cameron County?

9        A.   It was my knowledge that Cameron County

10   prosecutor's office did not want to come and get me.

11   That --

12                MR. STRANGE:  Objection, Your Honor.  That

13   would be hearsay.

14                MR. PADILLA:  Your Honor --

15                THE COURT:  That would be based on

16   hearsay; it will be sustained.

17       Q.   Excuse me.  Let me ask you this:  Were you

18   ever, were you ever afforded a hearing in Travis County

19   for the purposes of being transferred to Cameron County,

20   sir?

21       A.   No, sir.  The initial arrest was all.

22       Q.   Did anybody from the Cameron County Sheriff's

23   Office ever go, or did you ever meet with anybody from

24   the Cameron County Sheriff's Office in Travis County,

25   after your arrest?

1          THE WITNESS:  Your Honor, or -- my

2     attorney dealt with the prosecutor's office there, and

3     they attempted to get these proceedings moved up there.

4          MR. STRANGE:  Objection, Your Honor.  That

5     would be hearsay.

6          THE COURT:  I'll allow the response.  Go.

7     Ahead and ask the next question.

8          THE WITNESS:  I do have documents here as

9     to when Cameron County was knowledgeable as to where I

10    was.  So, that's not hearsay.

11         Q.   What documents do you have, sir?

12         A.   I am still looking, but -- no, that's not it.

13    The one is the one that I gave you, Mr. Padilla, and I am

14    looking for the readout.  I apologize, Your Honor.  I was

15    not -- I was hardly prepared for this.

16         Q.   Sir, do you recall what document, if any, you

17    received, sir?

18         A.   Yes.  I have a readout from the Travis County

19    Computer for all of the time I had spent so I would have

20    received credit here in Cameron County from Lieutenant

21    Marian there at the Travis County Sheriff's Department.

22         Q.   And, sir, again, when, in fact, were you

23    transferred to Cameron County?

24         A.   I -- May 30.  Or, no.  Cameron County?  I don't

25    recall, sir.

27

1    Q.    Okay.  Was it in 1998?

2    A.    1999.

3    Q.    And were you transferred directly to the Travis

4    County Sheriff's Department to the Cameron County

5    Sheriff's Department, or how were you transferred?

6    A.    I was brought through Trans Corp. from the

7    state of Illinois on a warrant from October 31 from Judge

8    Garza; not a state warrant.

9    Q.    So, therefore, that was the warrant --

10    A.    The warrant that said I was supposed to come in

11    front of the judge in ten days, that I never did, either.

12    Q.    You say it was dated October 31, 1998?

13    A.    Yes, sir.

14    Q.    And when was the warrant served on you, sir?

15    A.    I am not exactly sure.  Actually, yes, I am.

16    It was February 25 the day that Transco was notified to

17    pick me up on that warrant.

18    Q.    From your knowledge, about four months have

19    elapsed from the date of that order until the date that

20    you were actually transferred over to Cameron County?

21    A.    Yes, sir.

22    Q.    Prior to that time, sir, let's say from

23    October 1, 1998, to February 25, 1999, did anybody from

24    the sheriff's department contact you at all about being

25    transferred back to Cameron County?

1      A.   Uhm -- yes.

2      Q.   When were you contacted?

3      A.   In -- before I left -- before I left to Travis

4  County to go to Illinois, I had to wait ten days for

5  Cameron County to come get me.

6      Q.   And when were you transferred to Illinois?  Do

7  you remember when that was?

8      A.   I got there six days -- eight days before

9  Thanksgiving.  I apologize, but that's -- that's about

10  the best that I can --

11      Q.   So it was around some time around mid November

12  when you were transferred?

13      A.   Exactly.

14      Q.   Did -- when you say they are holding you for

15  ten days for Cameron County, to pick you up?

16      A.   Right.  They said it -- I was told -- here's

17  some more hearsay -- but I was told that they had ten

18  days to pick me up, or, otherwise I was free.  And I had

19  to wait longer for Illinois.  Well, Illinois came and got

20  me six days later, after the ten days.

21      Q.   Who was your attorney, sir, that represented

22  you in Travis County?

23      A.   Carolyn Deniro.

24      Q.   And were you familiar, or did you have any

25  conversations with Carolyn Deniro about being transferred

1    to Cameron County?

2        A.    Many times.

3        Q.    And -- without telling me exactly what the

4    conversation said, what did you feel was going to happen

5    to you?

6        A.    We attempted to expedite it continually.

7    Continually.  Like I said, the prosecutor in Travis

8    County -- whom I wish I had his card -- wanted to have

9    the case moved up there.

10                MR. STRANGE:   Objection, Your Honor

11   hearsay.

12                THE COURT:   It will be sustained.

13   Q.   (BY MR. PADILLA)  Do you know whether your attorney

14   in Travis County contacted the Cameron County district

15   attorney's office in an effort to expedite your case down

16   here?

17       A.    Yes, she did.

18       Q.    Did you receive any correspondence at all from

19   your attorney concerning efforts to get you transferred

20   to Cameron County?

21       A.    No -- not written.  I don't believe there was

22   any correspondence.

23       Q.    How many times did you meet with your attorney

24   in Travis County?

25       A.    Several telephones-- several -- (reviews

1    documents).

2      Q. Mr. LaFontaine, am I safe to assume, sir, that

3    from your arrest date, or your detention date of May of

4    1998, that you were ready, willing and able to have your

5    hearing heard on the State's allegation on the motion to

6    revoke?

7      A. I was ready as of May, 1998.

8      Q. And is it true, sir, that over 180 days have

9    elapsed that you were taken into custody, without a

10    hearing being afforded to you, on the State's motion to

11    revoke?

12      A. Yes, it is true.

13      Q. Sir, do you believe that your due process

14    rights under the state and federal constitution have been

15    violated by the State's failure to bring this matter to

16    hearing within 180 days of your arrest?

17      A. Sir, from everything that I have ever been able

18    to read -- as well read as I am, not that much -- it's

19    obvious that I've been violated, and laughed at.

20      Q. Do you believe, sir, that also your rights to a

21    fair trial, and a fair hearing have been violated by the

22    State's delay of bringing this case forward?

23      A. Yes, sir.

24      Q. And what do you base that on, sir?

25      A. Not enough room in the jails, maybe?

1    Q.   Okay.  Have additional allegations been added

2    to the subsequent motions to revoke that you've been

3    served with, that have not incurred, that have not

4    occurred as of May, 1998?

5    A.   No.  I don't believe so.

6    Q.   Okay.

7    A.   I don't believe there has been any

8    investigation done whatsoever until just recently.

9    Q.   When you were in custody, sir, at the Travis

10   County, did the Cameron County Probation Department ever

11   contact you about the possibility of filing a motion to

12   revoke?

13   A.   No.  But -- my attorney was working with,

14   supposedly, getting my probation moved up to Travis

15   County.  And then the probation department, or the

16   probation -- or the prosecutor's department according to

17   Mrs. Deniro --

18                 MR. STRANGE:  Objection, hearsay.

19                 THE WITNESS:  -- backed out again.

20   Q.   (BY MR. PADILLA)  Mr. LaFontaine, when is the last

21   time, sir, that you received any communications directly

22   from the Cameron County Probation Department, or any of

23   the Cameron County probation officers?

24   A.   (no response)

25   Q.   Let me ask you this:  Was it after May 8, 1998,

1  or prior to May 8, 1998?

2      A.    Prior.  I have not seen sand since then.

3              MR. PADILLA:  I pass the witness, Your

4  Honor.

5                      CROSS **EXAMINATION**

6  **BY MR. STRANGE:**

7      Q.    (BY MR. STRANGE)  Mr. LaFontaine, regarding

8  the telephone conversation that your attorney had with

9  the Cameron County prosecutors that was not done in your

10 presence because you were over at the jail section; is

11 that true?

12     A.    That is true.

13     Q.    So you would have no personal knowledge; you

14 are just basing that testimony on what your attorney told

15 you?

16     A.    Ah -- yes, sir -- and the --

17     Q.    Okay.  You've answered my question, sir.

18     A.    Sir?  And --

19              MR. STRANGE:  Objection.  Non responsive.

20              THE WITNESS:  -- and the oath that she has

21 as an attorney.

22              THE COURT:  Only answer the question,

23 please, Mr. LaFontaine.

24 Q.    (BY MR. STRANGE)  And regarding your contact with

25 the Cameron County Probation office, isn't it true that

1   it was your obligation to go to the probation department,

2   and not the Cameron County Probation Department's

3   obligation to go to you; is that true?

4       A.    I take the Fifth on that.

5       Q.    Have you ever gone by the name of Robert

6   Harris?

7       A.    I'll take the Fifth on that.

8             MR. STRANGE:  Judge?  I would ask the

9   Court to compel him to testify.

10            THE COURT:  It will be denied.  Go ahead

11  and proceed, Mr. Strange.

12            MR. STRANGE:  That's material for this

13  motion.

14            MR. PADILLA:  I don't think it is alleged

15  in the indictment, or in the motion to revoke that he

16  used an alias.

17            MR. STRANGE:  And I think it is material

18  to this hearing.  He is complaining about not being

19  brought down in a timely fashion, but he is using

20  aliases.  The bottom line, he has no right to take the

21  Fifth, if he's put on the stand.

22            THE COURT:  You mean, during the time that

23  he was locked up there?

24            MR. STRANGE:  It was at the time he was on

25  the street.

 1           MR. PADILLA:  Judge?  I instructed my
 2   client not to answer, if he pleads the Fifth.
 3           MR. STRANGE:  He is here to testify.
 4           MR. PADILLA:  And, again, we are not
 5   waiving the right.  If the Court is ordering him to
 6   testify, I would ask my client to invoke his Fifth
 7   amendment right.
 8           THE WITNESS:  Oh, here it is.
 9           THE COURT:  All right, Mr. LaFontaine.  I
10   will order you to go ahead and answer the question,
11   please, sir.  Ask the question, again, please.
12           THE WITNESS:  Yes, sir.  And all, excuse
13   me, I have also used the alias "Donald Duck, I Don't Give
14   A Fuck" on the C.B.  I have many comedy routines, and I
15   use a lot of different aliases.
16           MR. STRANGE:  Objection.
17           THE WITNESS:  I apologize.
18   Q.   (BY MR. STRANGE)  Have you ever used the name
19   "Edward Hauersperger"?
20       A.    Edward Hauersperger.
21       Q.    So "LaFontaine "is another alias?
22       A.    No, it's not.  LaFontaine was my step -- we
23   went through all of this, all at trial, if you'll recall,
24   Judge Garza.  "LaFontaine" was my stepfather's last name
25   that adopted me for a couple of years during my younger

```
 1   years.  When I became a man I decided to go by my
 2   father's name, especially after my grandfather passed
 3   away.  So I went back to my name Hauersperger.  The
 4   prosecutor, Mister -- whatever -- I cannot recall his
 5   name --
 6              MR. STRANGE:  Objection, Your Honor.
 7   That's nonresponsive.
 8              THE WITNESS:  -- tried to make it look
 9   that I was running with an alias.  I have a copy of my
10   Social Security card here, if you'd like to see it.
11              THE COURT:  Mr. LaFontaine?  I think
12   you've answered the question.  Okay?
13              THE WITNESS:  Hauersperger.
14              THE COURT:  Yes, sir.  That's what he
15   asked you.
16   Q.   (BY MR. STRANGE)  Have you ever used a date of
17   birth other than your true date of birth?
18       A.   No, I have not.
19       Q.   Have you ever used a Social Security number
20   other than your true Social Security number?
21       A.   No, I have not.
22              MR. STRANGE:  Judge, I would ask the Court
23   to take judicial notice of the Court's pre-sentence
24   investigation.  I believe it contains the TCIC and NCIC
25   report.
```

36

1      THE COURT:  All right, sir.

2  Q.   (BY MR. STRANGE)  So you were originally arrested

3  up in Travis County, Texas, back in May, 1998?

4      You want me to repeat my question, sir?

5      A.   (reviews documents)  Yes, please.

6      Q.   You were arrested in Travis County, Texas, back

7  in May of 1998?

8      A.   Yes.

9      Q.   And then you were also, you were charged in

10  Travis County, Texas for failure to register as a sex

11  offender; is that true?

12      A.   Yes, I did.  I still have a charge for that.

13      Q.   You still have a charge for that?

14      A.   Yes.  They released me with that charge there.

15  I was not held for a charge.

16      MR. STRANGE:  Objection.  Nonresponsive,

17  Your Honor.

18      THE COURT:  Just answer the question,

19  please, Mr. LaFontaine.

20      Go ahead and proceed.

21  Q.   (BY MR. STRANGE)  You were transferred from the

22  Travis county jail to the jail up in Logan County,

23  Illinois, because of the pending case you had up there?

24      A.   Yes, sir.

25      Q.   And that occurred in November or October of

1   1998, back in October of 1998?

2        A.   No.

3        Q.   Are you the same Edward Kent Hauersperger that

4   was convicted in 96-CF-157 in the Circuit Court for the

5   11th Judicial District of Illinois, or Lincoln County,

6   Illinois?

7        A.   No.

8        Q.   You are not the same person?

9        A.   No.  I was not convicted of that.

10       Q.   Were you placed on probation in that cause

11  number?

12       A.   No.  I reneged on that plea bargain.  It is

13  still open.

14            MR. STRANGE:  May I approach the witness,

15  Your Honor?

16            THE COURT:  Sure.

17       Q.   I have in my hand what is marked as State's

18  Exhibit No. 1, and take a look at that.  Does that appear

19  to be a judgment and sentence of the conditional

20  discharge in that case?

21       A.   Right.

22       Q.   Is that the correct case number that you were

23  charged with?

24       A.   Yes.

25       Q.   And that is in fact your name?

1      A.    Yes.

2      Q.    So this is regarding the case that you had up

3  in Illinois?

4      A.    Yes.  And this was, as I say, blocked.

5      Q.    And this is also a certified copy?

6      A.    Right.

7              MR. STRANGE:  Judge, I would offer State's

8  Exhibit No. 1 into evidence, and I would tender it to

9  Mr. Padilla for his inspection.

10             MR. PADILLA:  For purposes of this hearing

11 I have no objection.

12             THE COURT:  All right.  It's admitted.

13             **(State's Exhibit No. 1 admitted)**

14             THE WITNESS:  That is in the -- may I say,

15 that in Illinois, when you make a plea bargain you have

16 thirty days to change your mind.  That's what I did in

17 this case.

18             THE COURT:  All right, sir.

19             THE WITNESS:  That judgment no longer

20 stands.

21     Q.    (BY MR. STRANGE)  According to that judgment,

22 sir, as a condition of probation you were placed in jail

23 for 180 days, just according to that document that you

24 say no longer applies; is that true?

25     A.    No.

39

1      Q.   According to the judgment since you were placed

2  in jail for 180 days condition of probation.  Is that

3  what the judgment said?

4      A.   Ah, yeah.  That's what the judgment said.

5      Q.   Yes, sir.  Judgment also says that you received

6  jail credit for 180 days of that time; is that true?

7      A.   Right.

8              MR. STRANGE:  Judge?  I pass the witness.

9              MR. PADILLA:  I have no questions of the

10  witness at this time.

11             THE COURT:  You may step down,

12  Mr. Hauersperger.

13              MR. PADILLA:  I would like to call the

14  probationer in charge of this defendant's probation.

15             THE COURT:  You may step down, sir.

16         **(Witness excused at** 11:35 a.m.)

17             THE COURT:  Who is the next witness?

18             MR. PADILLA:  I would like to call -- your

19  name?

20             THE COURT:  Mr. Mata?

21             THE WITNESS:  Yes.

22

23

24

25

1              **JOSE LUIS MATA,**

2    having been first duly sworn, testified as follows:

3                **DIRECT EXAMINATION**

4

5    Q.   (BY MR. PADILLA)   Please state your name for the

6    record, sir?

7         A.   Jose Luis Mata.

8         Q.   Mr. Mata, are you the probation officer

9    assigned to Mr. Edward K. LaFontaine?

10        A.   Yes, I am.

11        Q.   Sir, how long have you been Mr. LaFontaine's

12   probation officer?

13        A.   Since, March 24, 1995.

14        Q.   Okay, sir.   And --

15        A.   I'm sorry.   1997.

16        Q.   March of 1997?

17        A.   Yes.

18        Q.   So, therefore, you were his probation officer

19   back in May of 1998; is that correct?

20        A.   Yes, I was.

21        Q.   Sir, do your files reflect what the probation

22   department first learned that Mr. LaFontaine was in

23   custody, in Travis County?

24        A.   In Travis County?

25        Q.   Yes.

1     A.   Yes, sir.

2     Q.   Okay.  And when was that?

3     A.   I don't recall the actual date, but I did

4 receive a phone call from the district attorney in Travis

5 County.

6     Q.   Was it -- was it this year, or last year that

7 you received a phone call?

8     A.   Last year.

9     Q.   Did you make any notations in your file

10 discussing as to who you may have spoken to, and what the

11 contents of the conversation was about?

12     A.   Yes, I did.

13     Q.   And, as a result of the conversation did you do

14 anything, sir?

15     A.   I did.  I went ahead and I spoke to

16 Karen Fisher, the D.A., who was in charge back then of

17 this court of the conversation with Mr. Madge in Travis

18 County.

19           THE COURT:  Is that the one back on August

20 17, or something like that?

21           THE WITNESS:  Yes.  August 17, 1998.

22           THE COURT:  All right.

23     Q.   So, therefore, your conversation was some time

24 prior to that date; is that correct?

25     A.   Yes.

42

1    Q.    Okay.  It would have been -- would you say, it

2  would have been a matter of weeks or months or how long

3  was the conversation back -- before August of 1998?

4    A.    It could have been maybe, within the week prior

5  to the phone call.

6    Q.    Sir, don't you repair a memorandum with the

7  district attorney's office requesting that a motion to

8  revoke be filed?

9    A.    Yes.

10   Q.    Do you have a copy of that memorandum in your

11 file, sir?

12   A.    Yes, I do.

13   Q.    And when is that memorandum dated?

14   A.    September 28, 1998.

15   Q.    Okay.  What if anything, sir, did you do in an

16 effort to -- to -- to assure that Mr. LaFontaine was

17 transferred to Cameron County for the purposes of hearing

18 the motion to revoke?

19   A.    Like I mentioned previously, I spoke to

20 Karen Fisher and I advised her of Mr. LaFontaine's status

21 in Travis County and I advised her that I was going to

22 obtain the offense report in order to file a motion to

23 get him over here on a motion to revoke.

24   Q.    Sir, after that, on that memorandum and that

25 discussion with Mrs. Karen Fisher with the district

1    attorney's office what if anything does your file reflect

2    is the next activity on your part with reference to Mr.

3    LaFontaine's case?

4        A.    That I can recall, sir, I remember speaking to

5    Karen Fisher, and her stating that she had filed a bench

6    warrant trying to get Mr. LaFontaine down to Cameron

7    County.

8        Q.    Okay, sir.  And after that, I mean, did you

9    yourself make any efforts to ascertain or whether the

10   bench warrant had been served on the defendant or not?

11       A.    Yes, I did.

12       Q.    And when did you make that determination, sir?

13       A.    I don't recall the actual date but I remember

14   speaking to Karen Fisher and having to speak to Willie

15   Warrants with the sheriff's department, in reference to

16   this bench warrant.

17       Q.    Would it have been some time after September of

18   1998, sir?

19       A.    Yes, it would have been.

20       Q.    From your recollection, was it 1998 or 1999

21   when you made that determination?

22       A.    1998.

23       Q.    Did you subsequently learn that the defendant

24   had not been bench warranted down to Cameron County?

25       A.    Yes, I did.

1      Q.   When did you learn that?

2      A.   I don't recall the actual date, but I was

3  advised by Karen Fisher.

4      Q.   Would that have been 1998 or 1999?

5      A.   1998.

6      Q.   What action did you take or did you personally

7  do, or take after you learned that the bench warrant had

8  not been perfected on the defendant that had been served

9  on the defendant?

10     A.   At the same time that I learned that he was not

11  brought down I asked Karen Fisher if anything was going

12  to be done.  And I think that a second bench warrant was

13  going to be issued to get him to come down here to

14  Cameron County.

15     Q.   Okay.  When did you first learn, sir, that the

16  defendant was in Cameron County?

17     A.   It had to have been, sir, after March of this

18  year.  March 3 was the conversation that I had with Kim

19  Turner from Lincoln County, up in Illinois.

20     Q.   Sir, did you even know, or was it even known to

21  you that the defendant had been transferred to Illinois?

22     A.   No.

23     Q.   So the sheriff's department never contacted you

24  to advise you of that?

25     A.   No.  I was not aware of that.

1          Q.    Did the district attorney's office ever call

2    you, and advise you that the defendant had been

3    transferred to Illinois?

4          A.    No.

5          Q.    So are you familiar with the State's Third

6    Amended Motion To Revoke?

7          A.    I have a copy of it, yes.

8          Q.    All right, sir.  And are there any additional

9    charges on the State's third amended motion to revoke

10   community supervision, that were not included in the

11   State's second or first amended motion if you know?

12                   MR. STRANGE:   Judge, this is irrelevant to

13   anything that is before the Court at this time.

14                   THE COURT:   I will allow the question.

15   Overruled.

16                   THE WITNESS:   There are differences on the

17   dates -- on failures to report to community supervision

18   offices.

19         Q.    So there would have been additional dates

20   alleged in the failure to report?

21         A.    Yes.

22                   MR. PADILLA:   I pass the witness.

23                        **CROSS-EXAMINATION**

24

25         Q.    (BY MR. STRANGE)   Sir, you are not responsible

1  for procuring prisoners from other jurisdiction; that's

2  the sheriff's department job; is that correct?

3       A.    That's correct.

4       Q.    Is there anything on the State's Third Amended

5  Motion that smacks of bad faith?  Is there anything there

6  that strikes you as untrue, or something that looks like

7  it was put on there for, maybe, an improper reason?

8       A.    No.

9             MR. STRANGE:  I pass the witness, Your

10 Honor.

11            THE COURT:  You may step down.  Next

12 witness, Mr. Padilla.

13            **(Witness excused at 11:40 a.m.)**

14

15            MR. PADILLA:  I call Mr. Cardoza to the

16 stand.

17            THE COURT:  Mr. Cardoza?

18            **WILLIE CARDOZA,**

19  having been first duly sworn, testified as follows:

20            **DIRECT EXAMINATION**

21

22 BY MR. PADILLA

23       Q.    Would you state your name for the record?

24       A.    Willie Cardoza.

25       Q.    How are you employed?

1      A.   I am a deputy sheriff and an arrest warrant

2  officer for the Cameron County Sheriff's Department.

3      Q.   And how long have you been a arrest warrant

4  officer?

5      A.   For about two years.

6      Q.   Would you have been a warrants officer for

7  Cameron County back in May of 1998?

8      A.   Yes.

9      Q.   Sir, do you have any familiarity with the

10 defendant named Edward K. LaFontaine?

11     A.   Yes, sir.

12     Q.   And, was it your responsibility or your

13 department's responsibility to attempt a bench warrant on

14 the defendant from Travis County?

15     A.   That's correct.

16     Q.   And do you recall when that bench warrant was

17 delivered to you for the purposes of trying to bring back

18 Mr. LaFontaine, sir?

19     A.   I don't have a specific date.

20     Q.   Would it have been in 1998 or 1999?

21     A.   In '98.

22     Q.   That was the initial one, right?

23     A.   Correct.

24     Q.   How many bench warrants had been tendered to

25 your office that you are aware of in an effort to bring

1     Mr. LaFontaine down for this warrant?

2          A.     I believe two bench warrants.

3          Q.     There was an original one back in 1998.  And

4     did you also execute the bench warrant to bring him down

5     from Illinois?

6          A.     Okay.  We assigned him to the officers to go

7     pick him up, and they would not release him to us.

8          Q.     Okay.  Is that in Illinois?

9          A.     In -- in Travis.

10         Q.     In Travis?  And you said you can't remember

11    when that was; is that correct?

12         A.     It was some time in '98.

13         Q.     Okay.

14                MR. STRANGE:  Judge?  For purposes of --

15    I've got Mr. Cardoza's paper work.  May I approach him

16    and give it to him so he can refresh his recollection?

17                THE COURT:  Any problem with that,

18    Mr. Padilla?

19                MR. PADILLA:  No problem, Your Honor.

20                THE COURT:  All right..  Go ahead.

21         Q.     (BY MR. PADILLA)  Mr. Cardoza, in reviewing

22    the documents can you try to identify what the date was

23    when the first warrant was tendered to you, if you can,

24    sir?

25         A.     Okay.  I don't have that information here.  The

49

bench warrant was returned back to the clerk's office.

1    Q.    Does the documentation in your file, reflect

2 when it is you went to Austin in an effort to bring back

3 Mr. LaFontaine?  Let me ask you this:  Did you go to

4 Austin, or did somebody from your department go to

5 Austin?

6    A.    On 11-9-98 they sent us a Teletype telling us

7 that he was ready for us to pick up.  We had ten days to

8 pick him up.

9    Q.    On November 8, 1988?

10   A.    That's correct.

11   Q.    Does your Teletype reflect that any bench

12 warrant was given to you, or handed to you, from any

13 agency within Cameron County to effect a retrieval of

14 Mr. LaFontaine?

15   A.    A bench warrant was issued but they would not

16 release him to us.

17   Q.    But when was the date that you went up there to

18 pick him up?

19   A.    We were going to go on the 17th, but he was

20 released to Logan County, Illinois.

21   Q.    So between November 9 and November 17, the

22 Cameron County Sheriff's Department did not retrieve the

23 defendant; is that correct?

24   A.    That's correct, because -- because they shipped

1   him out to Logan County.

2       Q.   Who were you speaking to at Travis County, sir,

3   in an effort to try to get Mr. LaFontaine back from the

4   sheriff's department, do you know?

5       A.   It is not in my notes, sir.

6       Q.   Sir, did you -- can you tell me who the officer

7   was that was sent to Travis County on November 17, 1998

8   to bring back Mr. LaFontaine?

9       A.   There were two officers assigned to that.

10       Q.   Which two officers were those?

11       A.   Deputy Gomez and Deputy Cortez.

12       Q.   Did Mr. Gomez and Mr. Cortez make the trip to

13   Austin to bring back the defendant?

14       A.   Ah, they didn't get to go because he was

15   released when they were going to go.  We had ten working

16   days to pick him up, and on the 17th he was released.

17       Q.   He was released on the 17th.  But when had you

18   made efforts to send Deputy Gomez and Deputy Cortez to

19   Travis County?

20       A.   When that bench warrant was issued but they

21   would not release him to us.

22       Q.   When was the bench warrant issued, sir?

23       A.   I don't have that information.

24       THE COURT:  You all want to look at the

25   file?  It's got all bench warrants in.  I told counsel

```
 1   last time that --
 2                   MR. PADILLA:  I understand.
 3                   THE COURT:  -- if you want to look at the
 4   file, look at the file.  You can see all of the bench
 5   warrants in it.
 6                   THE WITNESS:  September 10, '98, the bench
 7   warrant was issued.
 8   Q.   (BY MR. PADILLA)  Okay, sir.  Would it surprise
 9   you, sir, that Mr. LaFontaine was transferred to Illinois
10   on November 19, or you don't know when he was
11   transferred?
12       A.   I don't know the exact date that he was
13   transferred, but when we went to pick him up on the 17th,
14   he was gone already.
15       Q.   But you say that nobody ever went.
16       A.   I mean, whenever we called over there -- sorry
17   about that.
18       Q.   Okay.  And what date is the bench warrant
19   dated, sir?
20       A.   September 10, '98.
21       Q.   More or less, you waited about thirty days, did
22   you not, before -- before you made any -- before you made
23   any efforts to bring Mr. LaFontaine back?
24       A.   That's correct, because they would not release
25   him to us.
```

52

1    Q.   Well, does your record reflect when, after
2  September 10 of 1998, you called Travis County and
3  indicated that you were assigned on September 10, 1998?
4         THE COURT:  Wait a minute, wait a minute.
5  Counsel?  There is about seven or eight warrants or
6  orders, or warrants -- asking that he be bench warranted
7  in there.  And the first one I issued was in August.  And
8  then there was two that were issued in September.  The
9  first one was August 18, whether he was bench warranted
10  and was charged in Travis County.  The other one was
11  issued on September 3, September 9, September 30, a
12  warrant was issued in October.  And there was -- there
13  was another one issued, on October 1.  So there's about
14  six bench warrants ordered, or bench warrants in there.
15  I mean, I think it's a little confusing when you are
16  talking about.
17         MR. PADILLA:  Judge, he testified --
18         THE COURT:  Yeah.  I know.  But the
19  warrant says, they went up there in September and they
20  refused to turn him over.  And now he is talking about
21  one in November.
22         MR. PADILLA:  Your Honor, his testimony
23  is, that the warrant that he attempted to serve on the
24  defendant, in custody, was dated September 10.  If not,
25  I'll ask him.

1     Q.   Sir, what -- what date was the warrant issued

2   that you attempted to serve on November 17, 1998, sir, if

3   it wasn't the September 10 warrant?

4     A.   On November 17?  No.  He was ready to be

5   released to us.  He was done with the charges in --

6     Q.   Yes, sir.  But before he could be released to

7   you, he needed the warrant --

8     A.   No, because he was done with the charges over

9   there, in Travis.

10     Q.   Okay.  Well, when after September 10, 1998 does

11   your file reflect any conversations with the Travis

12   County District Attorney's Office, concerning the

13   sheriff's office, excuse me, concerning the transfer of

14   the prisoner, LaFontaine?

15     A.   There was a hold on him.

16     Q.   Yes, sir.  But what efforts did you or somebody

17   with the sheriff's office make in an effort to contact

18   the Travis County Sheriff's Department to get

19   Mr. LaFontaine transferred over to you.  If nothing was

20   done, then nothing was done.  If something was done, then

21   I want to know what was done with someone within your

22   department?

23     A.   Well, we just put a hold, and just to advise us

24   whenever he is ready, but, they never did, until

25   November --

54

1    Q.    November 9?

2    A.    November 9.

3    Q.    And they told you, you had ten days; correct?

4    A.    Correct.  Ten working days.

5    Q.    After November 9, what did you immediately do

6    to ascertain that Mr. LaFontaine would be coming to

7    Cameron County?

8    A.    Okay.  We sent him a Teletype saying we would

9    pick him up.

10    Q.    Okay.  Do you have a copy of the Teletype.

11    A.    On November 17, 1998, at 9 a.m.  Yes, I do have

12    a copy.

13    Q.    Yes, sir.  And that was received from what you

14    know in Travis County?

15    A.    Correct.

16    Q.    Because you testified earlier, they said that

17    they had a hold for him in Illinois; is that correct?

18    A.    They also had a hold for him in Illinois.

19    Q.    According to what the Court stated there was a

20    warrant issued in August of 1998; is that correct?

21         MR. STRANGE:  Judge?  As far as these

22    things are concerned he testified to those facts.  I

23    think you could take judicial notice of all these things,

24    there in your file.

25         MR. PADILLA:  I understand that, Judge.

1    But if we are violating due process then we have to

2    figure what he did or failed to do to see that he

3    violated due process.

4                    MR. STRANGE:  And I think he testified

5    what he did.

6                    THE COURT:  Go ahead and continue.

7        Q.    (BY MR. PADILLA)  Officer, again, prior to

8    August 3, I believe, of 1998, is there any other warrants

9    in your possession that were issued for the detention of

10   Mr. LaFontaine?

11       A.    Warrants or bench warrants?

12       Q.    Bench warrants from the court, or any document

13   in your possession, to hold the defendant herein?

14       A.    I know there were some issued but like I say

15   they were never released them to us.

16       Q.    Again, between May, 1998 through September of

17   1998, on how many occasions do you believe you spoke to

18   Karen Fisher concerning Mr. LaFontaine's detention?

19       A.    I don't recall.

20       Q.    Did you ever speak to Mrs. Fisher?

21       A.    I believe I talked to the D.A. in charge of

22   this case.

23       Q.    All right.  Who was that?

24       A.    I don't recall.

25                    MR. PADILLA:  I pass the witness, Your

1   Honor.

2                    **RECROSS-EXAMINATION**

3        Q.    (BY MR. STRANGE)   This Court started issuing

4   bench warrants, trying to get a bench warrant for

5   Mr. LaFontaine in August of 1998.

6        A.    I don't show that bench warrant.

7        Q.    You initially contacted the Travis County

8   Sheriff's Department in September of 1998 to try to get

9   Mr. LaFontaine back to Cameron County?

10       A.    When that bench warrant was issued?   That's

11  correct.

12       Q.    Is it your experience that when a person is

13  arrested in another county and they have pending charges

14  in this county, will they hold on to the person until the

15  business in that county is taken care of, or do they ship

16  him back down here?

17       A.    Well, it is up to the D.A., if they want to

18  give them back to us.

19       Q.    Assuming that they want to pursue the charges.

20  Will they keep them, or will they return them back here?

21       A.    Well --

22       Q.    Let me ask -- let me just ask you this:   Was

23  Travis County holding him because he had pending charges

24  in Travis County?

25       A.    Huh -- to my knowledge, they were.

1          Q.    And they would not release Mr. LaFontaine until
2     this business in Travis County was concluded?
3          A.    That's correct.
4          Q.    And you were notified by the Travis County
5     Sheriff's Department for the first time that
6     Mr. LaFontaine could be shipped back in November of 1998?
7          A.    According to my Teletype, that's correct.
8          Q.    And you attempted -- you had made arrangements
9     to go up on November 17, 1998?
10         A.    Yes, we did.
11         Q.    Were you or the sheriff deputies from Cameron
12    County prepared to go up and pick up Mr. LaFontaine on
13    September 17, 1998?
14         A.    Correct.
15         Q.    And you called up there and was informed by
16    Travis County that Mr. LaFontaine had been transferred
17    because of a hold in Illinois?
18         A.    Excuse me?
19         Q.    You did not go, only because you had learned
20    from Travis County that Mr. LaFontaine was no longer in
21    the Travis County Jail?
22         A.    Correct.
23         Q.    Have you, or anybody in your presence ever
24    acted in bad faith in this case?  Have you ever,
25    purposely not done something to purposely keep