Mr. LaFontaine in jail longer?

A.    No.

Q.    Have you made efforts to get Mr. LaFontaine back in as fast as possible?

A.    Yes.

Q.    When was Mr. LaFontaine brought back down to Cameron County Texas, if you know?

A.    From Illinois?

Q.    Yes, sir.

A.    They sent me a Teletype on February 25, 1999 stating that he was ready, and we got transferred to pick him up.

Q.    And this is the same situation as in Travis County.  They concluded their court business with Mr. LaFontaine, and told you that you were allowed to pick him up at that time?

A.    Yes, sir.

Q.    So the vast majority of the time that Mr. LaFontaine has been in custody, he has been in custody because he had pending charges against him elsewhere?

A.    Yes.

            MR. PADILLA:  I object unless he had personal knowledge of that fact.

            THE COURT:  He has already answered it.

```
 1    It will be overruled.
 2                   MR. STRANGE:  I will pass the witness.
 3         Q.   (BY MR. PADILLA)  Officer, again, from what
 4    you knew, the defendant was available to you, as early as
 5    November 9, 1998; is that correct, sir?
 6         A.   As early as November 9.  That's correct.
 7         Q.   And you have no personal knowledge as to what
 8    if anything else he had pending in Travis County or
 9    anywhere else, do you?  Do you have any personal
10    knowledge?
11         A.   I know that he had pending charges.  But I
12    don't know what charge.
13         Q.   But that was it, you don't know what charges
14    they were?
15         A.   No.
16                   MR. PADILLA:  I pass the witness.
17                   MR. STRANGE:  Judge, I have nothing
18    further for this witness.
19                   MR. PADILLA:  Your Honor?  I would like to
20    recall Mr. LaFontaine.
21                   THE COURT:  We are not going to conclude
22    at 12:00 at this point.  Let's go ahead and do the
23    following.  Mr. LaFontaine?  Let me -- well, you can go
24    over there.  We will break at this point in time.  Let's
25    continue with the case for Monday at this point in time.
```

1  We will continue with the evidence, and I suspect that we
2  will start at 9 o'clock.
3              MR. STRANGE:  Your Honor, I am going to be
4  out of town Monday and Tuesday.
5              THE COURT:  Mrs. Garcia is going to have
6  to take care over at that point.
7              MR. PADILLA:  I don't intend to call
8  Mr. Strange to come and testify anymore.  I will give him
9  permission to leave.
10             THE COURT:  We need to conclude the
11 hearing, if we're going to have other witnesses.  And
12 plus, the Court is going to, have another commitment
13 right now, but we will continue again Monday at nine.
14 All right.  Take him on back.  All right.
15             **(Court recessed at 12:00 p.m. and**
16 **reconvened Monday, May 10, 1999)**
17             THE COURT:  Let's start on Mr.
18 Hauersperger's case?  Do you have anymore witnesses?
19             MR. PADILLA:  I think the witness was on
20 the stand.  I call Mr. Hauersperger back on the stand,
21 Your Honor.
22             THE COURT:  All right, sir.
23
24
25

**EDWARD K. LAFONTAINE,**

having been first duly sworn, testified as follows,

to wit:

**DIRECT EXAMINATION**

THE COURT:  All right.  Let's continue.

MR. PADILLA:  Thank you Your Honor.

Q.   (BY MR. PADILLA)  Would you please state your name for the record, please?

A.   Edward Kent Hauersperger, also known as, Edward Kent LaFontaine.

Q.   Mr. Hauersperger, on Friday we were conducting a hearing that we reset for this morning.  Sir, can you tell the Court when you actually were transferred out of Travis County to the state of Illinois?

A.   No.  I'm saying, approximately, November 19 or the 20th.

Q.   So, Mr. Cardoza, stated on the 17th you had already been transferred to Illinois; is that an untruth, sir?

A.   Yes, it is.

Q.   Do you have any documents in your possession to indicate your transfer date out of the jail from Travis County?

A.   Yes, I do.

Q.   Can we have an opportunity to look at them, and

1    maybe offer them as an exhibit?

2        A.   This would be the -- this is the arrest entry.

3    This is the detention entry, that shows where I was

4    released, and the time and date.

5        Q.   Yes, sir.  Let me mark Defendant's One and

6    Number Two, Your Honor, and show them to the State.

7              MS. GARCIA:  No objection, Your Honor.

8              THE COURT:  All right.  It will be

9    admitted.

10          **(Defendant's Exhibit No. 1 admitted)**

11          MR. PADILLA:  Your Honor, let me ask you,

12    sir, Defendant's Exhibit No. 1, 11/19/98, is that the

13    date you were transferred, to your knowledge, out of

14    Travis County?

15        A.   Yes, sir, that morning, I was picked up by

16    Transco from a Mr. and Mrs. Bowman.

17        Q.   And sir, Defendant's Exhibit No. 2, what does

18    that reflect, sir?

19        A.   That reflects my arrest in Austin.

20        Q.   And what was the arrest date on that, sir?

21        A.   The arrest date was May 30, 1998.

22        Q.   Sir, do you have any other documentation from

23    the Cameron County Sheriff's Department concerning

24    efforts to transport you back to Cameron County?

25        A.   Yes, I do, sir.

1        Q.   I understand that you have some Telefax;

2 transmissions, copies of requests from the Cameron County

3 Sheriff's Department; is that correct, sir?

4        A.   Yes, sir.  This was January One.  This was from

5 my original arrest.

6        Q.   I am going to show you for purposes of the

7 record which we will identify as Defendant's Exhibit No.

8 3.  Does this appear to be, sir -- are you familiar with

9 this document?

10       A.   Yes, sir.

11       Q.   I will show it to the State.

12            MS. GARCIA:  I have no objections Your

13 Honor.

14            THE COURT:  All right.  It's admitted.

15            MR. PADILLA:  I offer number three.

16            **(Defendant's Exhibit No. 3 admitted)**

17            THE COURT:  It's admitted.

18       Q.   Does this appear to be from the Cameron County

19 Sheriff's department Willie Cardoza to the Travis County

20 Sheriff's Department?

21       A.   No.  This is to Logan County, Illinois.

22       Q.   Actually this was effected January 5, 1999 is

23 that correct?

24       A.   Yes, sir.

25       Q.   Do you have any other documents, in your

1    possession, sir, that you would like the Court to look

2    at?

3         A.    Yes, sir.  I do, sir.  I have a fax here from

4    Cameron County to Austin Police Department, notifying

5    them that they want to hold me on the 30th of May, 1998,

6    for housing, and for them to pick me up.

7              MR. PADILLA:  I will mark this, then, as

8    Defendant's Exhibit No. 4 and show it to the State.

9              MS. GARCIA:  No objection, Your Honor.

10             THE COURT:  All right.  It's admitted.

11             **(Defendant's Exhibit No. 4 admitted)**

12        Q.    (BY MR. PADILLA)  Sir, did you, personally

13   yourself ever make contact with anybody from the Cameron

14   County Sheriff's Department, anywhere from May 30th, 1998

15   until February of this year, sir?

16        A.    Until when, sir?

17        Q.    When were you brought to Cameron County?

18        A.    I was -- February -- the end of February.  The

19   end of February, is when I became Cameron County's

20   property --

21        Q.    Yes, sir.

22        A.    -- as such.

23        Q.    My question to you:  As you were arrested on

24   May 30th, 1998 to February 25, 1999 did you personally

25   have an opportunity to meet with anybody from the Cameron

1    County Sheriff's Department?

2         A.   Not whatsoever.  I actually, I sent letters.  I

3    made many attempts, and I never did.

4         Q.   Did anybody from the Cameron County Probation

5    Department contact you either in person, or by writing,

6    while you were detained at the Travis County Sheriff's

7    office, or sheriff's jail?

8         A.   None whatsoever.  Nor were any of my letters --

9    wrote back to me.

10        Q.   Who were you writing to, sir?

11        A.   Several addresses that I had for Cameron

12   County.

13        Q.   And do you remember who, specifically, it was

14   generally addressed?

15        A.   Just generally addressed:  To whom it may

16   concern.

17        Q.   Did you attempt to make any contact whatsoever

18   during that ten month period?

19        A.   Huh -- yes, I did.  I wrote Judge Garza.  I am

20   sure has copies of several of my letters trying to get

21   transcripts from my trial.

22        Q.   Yes, sir.

23        A.   But -- this is only one that I was -- that I

24   have located this morning.  I didn't think about it this

25   morning.  This short one that I had mailed.

66

1     Q.   And did you, yourself, receive any

2  correspondence from the court indicating to you what if

3  anything was going to be done with you, pending the

4  motion?

5     A.   None whatsoever.

6     Q.   Did you have an opportunity, sir, to address

7  any correspondence to your probation officer indicating

8  what was going to be known to you?

9     A.   No, sir.

10     Q.   Other than the Court, to whom did you make

11  contact with, if you know sir?

12     A.   American Civil Liberties Union, Federal Bureau

13  of Investigation, several attorneys, my father who is a

14  special agent himself for quite some time.  But, finally,

15  I found out I had been kidnaped over -- and that's -- I

16  guess that's pretty much it.  That's pretty much it,

17  other than attorneys that I was appointed, like Carolyn

18  Deniro in Austin.  She tried to do quite a bit for me but

19  her hands were bound.  This case was not given to her as

20  such for her to deal with.

21     Q.   And, so, I mean, all during the time that you

22  have been incarcerated you have been making efforts on a

23  daily, and on a weekly basis, trying to have your case

24  heard and moved; is that correct?

25     A.   Yes, I have.

```
 1         Q.    And what has been the result of those efforts?
 2         A.    None.
 3                    MR. PADILLA:  I pass the witness, Your
 4    Honor.
 5                         CROSS EXAMINATION
 6    BY MS. GARCIA:
 7
 8                    MS. GARCIA:  Your Honor may I propose the
 9    witness.
10                    THE COURT:  You may.
11                    MS. GARCIA:  Thank you.
12         Q.    Mr. LaFontaine, I am going to show what has
13    been marked as State's Exhibit No. 2 and 3, sir.  Have
14    you seen these documents before?  I will withdraw that
15    question and I will ask you, sir is that your signature
16    in State's Exhibit No. 2, Mr. LaFontaine?
17         A.    Yes, it is.
18         Q.    State's Exhibit No. 3, is this your signature
19    Mr. LaFontaine?
20         A.    Yes, it is.
21         Q.    Thank you.  Mr. LaFontaine, after September 3
22    of 1998, did you have a court date set in Austin, Travis
23    County, Texas?
24         A.    I don't understand your question.
25         Q.    September 3, 1998, you were in Travis County,
```

1    do you recall?

2        A.    I do not recall.

3        Q.    Do you recall that you had been indicted for

4    theft --

5        A.    Oh, yes.  September 3 I was incarcerated.

6        Q.    Mr. LaFontaine, let me finish my question so

7    you can answer it.  Okay, sir?  Do we have an agreement?

8    Yes?

9        A.    Yes.

10        Q.    Okay.  September 3, 1998, you were in Travis

11    County; correct?

12        A.    Yes.

13        Q.    After September 3, 1998, did you have a court

14    date for the offense of failing to register as a sex

15    offender, sir?

16        A.    I'm not sure.

17        Q.    But you were in court in September of 1998;

18    correct?

19        A.    Right.  Oh, ma'am, I do recall.

20        Q.    Sir, what do you recall being in court.  Yes?

21        A.    No.  I was not in court.  My attorney was --

22    the prosecutor wanted to put that off until Cameron

23    County did their case.

24        Q.    I'm sorry.  Mr.LaFontaine, my question is:  You

25    were in court on September 9, 1998.

1      A.    Right.

2      Q.    And you had a pending charge for failing to

3   register as a sex offender; right?

4      A.    I don't believe I was in court on that date,

5   ma'am.

6      Q.    But on September, 1998, you were in court for

7   that offense, weren't you?

8      A.    No.  I don't believe I was, ma'am.

9      Q.    And, in November of 1998, you were extradited

10  to Logan County; correct?

11     A.    Yes.

12     Q.    And that is Logan County, Illinois?

13     A.    Yes.

14     Q.    And on the second day of March of 1999, you

15  were convicted for theft in Logan County; is that

16  correct?

17     A.    Correct.  That has been overturned now.

18     Q.    Sir, I just need you to answer "yes" or "no"?

19     A.    Well, ma'am, you are asking --

20     Q.    Mr. LaFontaine?

21     A.    You are asking if I ate a steak sandwich, and

22  no, we puked it up.  It was non-nutritious.

23           MS. GARCIA:  Your Honor, I would ask the

24  Court to instruct the witness to answer my question?

25           THE COURT:  I think we have already

1   covered this area, Mr. LaFontaine.  I think you already

2   made that remark last week that you plead guilty, and

3   then you withdrew your pleas.

4                    THE WITNESS:  Exactly.

5                    THE COURT:  So that's fine.  Answer the

6   question, please.

7                    MS. GARCIA:  Thank you, Judge.

8        Q.   Mr. LaFontaine, when you were in Travis County

9   you were being held for several charges; is that correct?

10       A.   I was being held for the number one charge of

11  Cameron County Probation violation of sexual assault.  No

12  bond.

13       Q.   Mr. LaFontaine?

14       A.   According to A. Tidwell, No. 410, I have the

15  document here, ma'am.

16       Q.   Mr. LaFontaine, just answer my question, sir.

17                   MR. PADILLA:  I think the witness is

18  trying to answer the question, Judge.

19                   THE COURT:  Only have him answer the

20  question, yes or no, Mr. Padilla.  And then he can

21  explain it.  He has been doing that, all of the time.

22  Just answer the question, please.

23       Q.   Mr. LaFontaine you were also being held for

24  consuming alcohol in a public place; correct?

25       A.   No.

1    Q.   And you were released, weren't you, from Travis
2  County; weren't you?
3    A.   Many times.
4    Q.   So then it's not true that you were being held
5  from -- from the 30th day of May, 1998 up until November,
6  1998.  Correct?
7    A.   Yes, it is true.
8    Q.   But you were released, weren't you?
9    A.   Not during that time.  No, I was not.
10   Q.   But you were released to Logan County?
11   A.   No, it -- I was not.
12   Q.   In November of 1998, you were released to Logan
13 County, Illinois?
14   A.   Yes, I was --
15   Q.   Mr. LaFontaine answer my question.
16   A.   -- they failed to pick me up within ten days.
17 You released me to Illinois.  Travis county did not.
18             THE COURT:  All right.  Continue, ma'am.
19   Q.   Mr. LaFontaine did you have an opportunity to
20 meet with Jose Luis Mata, the probation officer, from
21 Cameron County?
22   A.   No.
23   Q.   You never met with Mr. Mata, in May -- I'm
24 sorry -- in March of 1997?
25   A.   I may have.  I do not recall.

1       Q.  But you met somebody from the probation

2 department after you were found guilty, didn't you, sir?

3              MR. PADILLA:  I object to the line of

4 questioning.  Right now we are trying to disqualify the

5 district attorney's office, and also a motion to dismiss

6 for violation of my client's due process rights.

7              THE COURT:  I don't think we are covering

8 the merits.

9              MR. PADILLA:  My understanding is, we were

10 going to do the hearing first on the --

11              THE COURT:  Sure.

12              MR. PADILLA:  -- on the disqualifying.  If

13 the Court does not see fit to disqualify --

14              THE COURT:  I don't know how far you're

15 going to go into this point, whether you are going into

16 the violations now, because, I don't think that we have

17 to address that yet, or are you going to address the fact

18 that he was on probation, basically.

19              MS. GARCIA:  If the Court is going to make

20 a ruling on whether to disqualify the D.A.'s office at

21 this point, Your Honor, then we have no further questions

22 of this defendant.

23              MR. PADILLA:  I think that was the

24 agreement.  We were going to take that up first.

25 Secondly --

1              THE COURT:  All right.  Anything else?

2              MS. GARCIA:  No, Your Honor, I have no

3    further questions of this witness.

4              THE COURT:  Anything further?

5              MR. PADILLA:  Yes, Your Honor.

6    Q.   (BY MR. PADILLA)  Mr. Hauersperger do you have any

7    documentation to indicate that he had any document that

8    he was referring to while you were in Travis County?

9         A.   Yes, I do.  I have a couple.

10        Q.   Okay.  Can you please show one of them so I can

11   tender them to the Court?

12             MS. GARCIA:  No objection, Your Honor.

13             MS. GARCIA:  I will offer Defendant's

14   Exhibit No. 5, sir.

15             THE COURT:  It will be admitted.

16             **(Defendant's Exhibit No. 5 admitted)**

17   Q.   (BY MR. PADILLA)  Can you tell me what Defendant's

18   Exhibit No. 5 is, this document.

19        A.   This is a request to know what my charges to R.

20   And D. Records, and -- I don't know -- to the cops behind

21   the computers.

22        Q.   And --

23        A.   "Need to know charges, holds and/or detainers,

24   please.  Call numbers were available, sir, is Mr. A.

25   Tidwell's answer.  Cameron County probation violation.

74

1   Sexual assault.  No bond.

2              Number two:  Out of State Illinois theft,

3   $15,000 or 10 percent of that."

4              If I would have -- if I would have been

5   able to attend my grandmother's funeral --

6      Q.   Would this indicate to you that those were the

7   charges that you understood that date to be the charges

8   that they were holding you for?

9      A.   Those were my exact -- I have others stating

10  the same.  I was being held for Cameron County.  That's

11  what I was arrested for; that's what I was being held

12  for.  The officers that arrested me, Officer Vineyard,

13  showed me on his screen --

14             MS. GARCIA:  Your Honor, I object.  He is

15  going into a narrative.  Objection, Your Honor --

16             THE WITNESS:  -- he found me.

17             THE COURT:  Just a minute, sir.

18             THE WITNESS:  He found me for the warrant

19  for Cameron County.

20             THE COURT:  Sustained.

21  Q.  (BY MR. PADILLA)  Mr. Hauersperger, so then, none

22  of the documents that you have, or the requests that you

23  made listed any other offense, to your knowledge, other

24  than that they were holding you for the Cameron County,

25  and also for the Illinois matters; is that correct?

```
 1        A.    Right.

 2                    MR. PADILLA:  I'll pass the witness.

 3                    MS. GARCIA:  I have no further questions.

 4                    THE COURT:  Mr. Hauersperger, you did send

 5    me a letter in August, I believe in 1998.  That was the

 6    purpose of the appeal, and I granted it.  I don't know if

 7    you got a request from the Court.  The Court did agree to

 8    go ahead and grant your request because you wanted to

 9    perfect the appeal.  Did you get the information from

10    court reporter, or from the district clerk?

11                    DEFENDANT LAFONTAINE:  No, none

12    whatsoever, Your Honor.  I never did, whatsoever.

13                    THE COURT:  That was sent -- I approved

14    it, and I was looking through my file, and there is note

15    on here, and the Court granted this request back in

16    August 17, 1998.

17                    THE WITNESS:  Not to be dramatic but I

18    have literally cried over the desire.

19                    THE COURT:  What's that?

20                    THE WITNESS:  Not to be dramatic, but I

21    have literally cried over that desire.

22                    THE COURT:  I mean, I granted that

23    response.  I didn't have a problem with you -- if you

24    want to appeal, whatever.  All right.

25                    MR. PADILLA:  Judge, if that's the case,
```

```
 1   Your Honor, these -- let me ask Mr. Hauersperger, do you
 2   still wish to appeal your matter your original conviction
 3   of sexual assault?
 4              THE COURT:  Yes, that's not -- he wanted
 5   the transcript to consider filing an appeal.  I granted
 6   the right to have his transcript.  The case had been
 7   tried years before, in '97, so I think the notice of
 8   appeal is untimely.  The only thing he could have done
 9   was maybe file a writ.  That's about the only thing he
10   did.  But he went to trial before a jury, the jury found
11   him guilty and the jury also gave him probation.  But,
12   those are the appeal rights that he had previously.  The
13   point of the matter, is, that the letter that he sent me
14   was for purposes of receiving a transcript.  Nothing --
15   nothing was indicated to me in the letter that -- or
16   anything that he is covering today.
17              THE WITNESS:  My belief, is, once I
18   receive the transcripts I can easily get an appeal.
19              THE COURT:  Very well.
20              MR. PADILLA:  Well, Your Honor --
21       Q.   So, it's my understanding, sir, that whatever
22   appeal rights you may have pertaining to the sexual
23   assault conviction, you want to exercise those rights to
24   appeal, whatever rights you may have.  Is that correct?
25       A.   Yes.
```

1      Q.   And that includes a petition for discretionary

2   review to the Court of Criminal Appeals to reopen your

3   case, you would want to entertain that; is that correct?

4      A.   Yes.

5                MR. PADILLA:  I pass the witness, Your

6   Honor.

7                THE COURT:  You may step down, sir.  Any

8   other witnesses, Mr. Padilla?

9                MR. PADILLA:  No.  I don't believe so.

10                THE COURT:  Mrs. Garcia, any other

11   witnesses?

12                MS. GARCIA:  Your Honor, what issue are we

13   going to be covering now?

14                THE COURT:  Are you familiar with the

15   violation of the alleged violation of the speedy trial,

16   or the delay in bringing him down here?  That's primarily

17   that.

18                MS. GARCIA:  I have no further witnesses

19   on that matter.

20                THE COURT:  Anything else Mr. Padilla on

21   this matter?

22                MR. PADILLA:  Just a little summation, if

23   the Court will allow me?

24                THE COURT:  Go ahead.

25                MR. PADILLA:  I believe, Your Honor, that

1  the defendant's constitutional rights to speedy hearing

2  under the Speedy Trial Act under the Code of Criminal

3  Procedure has been violated.  The defendant was in

4  custody for a long period of time, at least from, I mean,

5  excuse me from May 30, 1998, through November.  The state

6  of Texas through the district attorney, and also through

7  the Cameron County Probation Department failed to take

8  any action whatsoever to try to bring the defendant down

9  here, so he could have this hearing.

10              Secondly, I believe that is also a

11  violation of his due process rights guaranteed by the

12  Constitution of Texas, and of the United States

13  Constitution, and he could not afford an opportunity to

14  be here.

15              As a result of the delay, I believe the

16  testimony is clear that the State has added additional

17  charges, additional failures to report, things of that

18  nature.  And sir, and I believe that not only has he been

19  prejudiced of being in custody and not being able to be

20  released from custody, he was also been prejudiced

21  because of the fact because of the State's actions, or

22  in-actions, he has had to answer to additional charges,

23  you know, and I think that's a violation of his due

24  process right.

25              Furthermore, the state of Texas, the

1    Cameron County District Attorney's office, has a vested

2    interest in attempting to prosecute this defendant only

3    because of the fact -- because the district attorney's

4    office has been lax in prosecuting this case.  So I think

5    they are in conflict that the only purpose or reason -- I

6    think the evidence shows the only reason why a hearing is

7    being conducted as it is now, with the enthusiasm, now as

8    a result that the defendant has attempted to exercise

9    constitutional rights to a fair hearing.  So I believe

10   they should be disqualified by law in prosecuting this

11   defendant, because of their vested interest of presenting

12   their own rights, and not actually the right of the state

13   of Texas, as an agency of the state of Texas.  In that

14   respect, Your Honor, we would argue because the state's

15   actions, demeanors and attitudes that they have exercised

16   in this cause of action, that they violated my client's

17   constitutional rights.  So we are asking that they be

18   disqualified.

19            Secondly in the alternative, if the Court

20   does not see fit to disqualify the D.A.'s office, that

21   the Court find a delay in bringing this case forward, and

22   has violated the defendant's constitutional rights to due

23   process, and that he be ordered released to continue on

24   probation, until the remainder of his probation term.

25

1              MS. GARCIA:  Your Honor, If I may respond?

2              THE COURT:  All right.

3              MS. GARCIA:  Thank you.  Your Honor, as to

4    this disqualification of the district attorney's office

5    when Mr. Strange and myself took the stand, we didn't

6    testify to anything that would prejudice this defendant,

7    in that we didn't try our best efforts to bring it

8    forward.

9              Second, Your Honor, the speedy trial that

10   has been raised is unconstitutional.  I think what we

11   have to look at, is whether due diligent was exercised by

12   our office, by the county and I believe that has been

13   proven.  You can see from the Defendant's exhibit that,

14   yes, he has been in custody since May of 1998, but also

15   through the testimony of other witnesses, we know that as

16   of September, 1998 this defendant was not released to our

17   custody, in Cameron County, because he already had a

18   trial date in Travis County.  So Travis County refused to

19   release him.  Not only in November of 1998 was the county

20   ever able to go pick him up as Mr. Cardoza testified that

21   he wasn't released to us.  We didn't pick him up; Logan

22   County did.  So we did everything possible to exercise

23   due diligence to bring this defendant forward.  You can

24   see from his own exhibits that they didn't have a hold on

25   him from Cameron County.  He had a hold from Logan

1  County.  So, whichever way it would go, Logan County

2  could take him; Cameron County was not going to be the

3  first one to take him.  Indeed, they took him, and kept

4  him up in Logan County, Illinois.  Once they were done

5  with him, that's when we were able to bring him back from

6  out of state, to Cameron County, to face the motion to

7  revoke.  And in the amended motion to revoke, Your Honor,

8  the motion was clarified, the district attorney's office

9  did not act in bad faith in adding any new charges.

10           The only thing the district attorney's did

11  do was clarify the motion to revoke and to change the

12  wording from being "placed on probation" to being

13  "convicted by a jury," Your Honor.  And the allegations

14  of "failure to report" -- none of them were added on.

15  They had previously been set forth in the State's First

16  Motion To Revoke.

17           THE COURT:  All right.

18           MR. PADILLA:  Your Honor?  May I address

19  one point as to due diligence of it.  If the Court will

20  decide to consider the information provided by the

21  witness Cardoza, Your Honor, he stated that Travis County

22  in November, I believe, on November -- on November 9, if

23  I am not mistaken, called them and advised them that they

24  had ten days to pick up the defendant, and that they were

25  through with him.  They had ten days to pick him up.  The

1    evidence that the defendant has introduced here this

2    morning, Your Honor, shows he was not transferred out of

3    Travis County, to Logan County, until the 19th.  So the

4    State of Texas -- excuse me -- Cameron County had ten

5    days to go pick up this defendant, but they didn't do it.

6    The fact that he was on the 19th he was transferred over

7    to Logan County when Cameron County said, all they did

8    was call up there, no deputies up there, they did nothing

9    other than make one phone call and they said they would

10   turn them over to Logan County.  And I would assume, Your

11   Honor, that it would be fair to deduce from the evidence

12   that Logan County had already called and said they wanted

13   him.  But the Cameron County Sheriff's Department did

14   nothing other than one phone call.  And he was not

15   transferred until the 19th.  So Cameron County did not

16   exercise due diligence when they had ten days to go down

17   and pick up this defendant, and he was there for ten

18   days, other than allegedly making one phone call.

19                THE COURT:  I think from the evidence

20   presented today, from last week and today, and the

21   exhibits, there is no question that Mr. LaFontaine or

22   Hauersperger, has been in detention for quite a period of

23   time.  In fact he has expressed that throughout the time

24   that he was here.  I think as far as the Court is

25   concerned, and the court record will reflect the

1   following:  That there are many bench warrants that I
2   started issuing since August to try to get him over here,
3   trying to get him down here to set it down for trial.
4   There is a notation, like Mr. Cardoza testified, that
5   Travis County would not release him one time, and then
6   later on, when they went to get it, they were -- they
7   were not, he was not there.  I don't think there is a
8   question -- there is some questions raised as far as the
9   sheriff's office trying to get anything done, to try to
10  get him down here.
11                As far as the district attorney's, the
12  motion to recuse the district attorney's office is
13  denied.  The amended motion that was filed does not
14  specifically say anything indifferent from the second
15  motion to amend.  Even if they were acting vindictively
16  on this case as the defendant is trying to assert they
17  certainly would have put the other case -- the criminal
18  case of which the defendant entered a plea to, where he
19  now says that we withdrew his plea.  So they could have
20  done that on that particular motion to revoke probation,
21  on the third alleged motion that was not done.
22                There is a lack -- there is some lack of
23  diligence, I think.  However, the Court is not going to
24  find that it raises to the level of a dismissal.  To
25  grant the dismissal -- and I will not dismiss this motion

1   to revoke due to the due diligence.  In my opinion, based

2   upon the amount, the bench warrants that were issued and

3   all of this information that was done, I think everything

4   was in proper form.  Other places had jurisdiction.

5               DEFENDANT LAFONTAINE:  Who were the bench

6   warrants handed to?

7               THE COURT:  Other defendants, other

8   jurisdictions had matters over this case.

9               MR. PADILLA:  Your Honor --

10              THE COURT:  The motion is denied.

11              MR. PADILLA:  Based on the Court's ruling,

12  Judge, Mr. Hauersperger's representation to the Court, he

13  wishes to appeal the previous conviction, and we would

14  ask that the motion to revoke be suspended, and I'll

15  give -- I will give oral notice at this time to the Court

16  that I intend to file a petition for discretionary review

17  to the Court of Criminal Appeals.

18              THE COURT:  The only thing I can do on the

19  previous case, like I said, if he wants a copy of the

20  transcript, he can get a copy of the transcript for

21  purposes of filing his writ, and I have already granted

22  that previously on the letter that he sent me.

23              MR. PADILLA:  We would ask --

24              THE COURT:  I read everything that was

25  sent to me, and that was the letter that I got.  So I

1   have no problem with providing him the transfer, and your

2   review of the writ.  You can consider filing the writ,

3   and if you want to file the writ, file it.  But you need

4   to -- that request is granted as far as that concerned.

5   But for purposes of this motion, that's a different

6   matter that you have to consider.

7               MR. PADILLA:  Yes, Your Honor.  If I file

8   a writ of discretion to the Court of Criminal Appeals, if

9   the Court were to grant that, then, that would suspend

10  the imposition of any matters pertaining to the sentence.

11  What I'm asking the Court, then, is to abate the motion

12  to revoke, to allow for the transcript to be prepared, to

13  allow for the writ and the discretionery review to be

14  filed with the Court of Criminal Appeals up in Austin,

15  and You Honor also ask the defendant be allowed a bond

16  awaiting hearing for a determination of the the Court of

17  Criminal Appeals.

18              THE COURT:  The request is denied.  He is

19  not entitled to that.

20              MR. PADILLA:  Your Honor, he would be

21  entitled to it, if it was in the form of discretionary

22  review.  I understand that the Court would grant it, but

23  what we are asking the Court to do, is abate it, Your

24  Honor.

25              THE COURT:  I'm not going to abate

```
 1   anything.  There is no legal basis to abate this matter,
 2   at this point in time, Mr. Padilla.
 3                 MR. PADILLA:  Your Honor --
 4                 THE COURT:  If you're telling me that you
 5   want to appeal something, or file a writ on a conviction
 6   that occurred in 1997 --
 7                 MR. PADILLA:  Your Honor --
 8                 THE COURT:  -- saying, you may reverse
 9   that case, I don't know if that should happened, based
10   upon the writ.  But on this matter, you have preserved
11   your motion for speedy trial, or your motion to dismiss.
12   That has been preserved, and preserved evidence.  All of
13   these exhibits are in.  The Court of Appeals make take a
14   different position on whether -- if there was due
15   diligence or not.  That is up to them to decide.  But on
16   the motion to revoke, if the Court of Appeals decides to
17   set it aside, then, of course, the motion to revoke will
18   be set aside.
19                 MR. PADILLA:  Yes, Your Honor.
20                 THE COURT:  At this point in time, it will
21   be denied.  You will entitled to get a transcript of the
22   previous proceedings, and you will be entitled to get a
23   transcript of these proceedings, once you file the proper
24   motions.
25                 MR. PADILLA:  Your Honor, again, I think
```

1    the Court has within its powers has the right to suspend

2    and abate this hearing, pending the Court's

3    discretionary --

4                    THE COURT:  It will be denied,

5    Mr. Padilla.

6                    MR. PADILLA:  Yes, Your Honor.

THE STATE OF TEXAS:

COUNTY OF CAMERON:

I, ADELAIDO FLORES, Official Court Reporter in and for the 138th District Court of Cameron County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-entitled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND on this the 24th day of August, 1999.

ADELAIDO FLORES, Texas CSR
Expiration Date: 12/31/200
Official Court Reporter
138th District Court
Cameron County, Texas
974 East Harrison Street
Brownsville, Texas 78520
(956) 544-0874