13 99 329       CR RECEIVED

IN THE 13TH COURT OF APPEALS
EDINBURG OFFICE

SEP 13 1999

CATHY WILBURN, CLERK
BY

1

REPORTER'S RECORD

VOLUME 4 OF 5 VOLUMES

TRIAL COURT CAUSE NO. 96-CR-1627-B

- - - - - - - - - - - - - - x
                            :
THE STATE OF TEXAS          : IN THE DISTRICT COURT
                            :
VS.                         : CAMERON COUNTY, TEXAS
                            :
EDWARD K. LAFONTAINE, A/K/A :
EDWARD KENT HAUERSPERGER,   :
DEFENDANT                   :
                            : 138TH JUDICIAL DISTRICT
- - - - - - - - - - - - - - x

STATE'S MOTION TO REVOKE HEARING

On the 10th day of May, 1999, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Robert Garza, Judge Presiding, held in Brownsville, Cameron County, Texas:

Proceedings reported by machine shorthand.

ORIGINAL

DELIVERED SEP 13 1999

1                    **A P P E A R A N C E S**

2    APPEARING FOR THE STATE:

3            HON. JEFF STRANGE & GABRIELA GARCIA
             Assistants to the District Attorney
4            SBOT NO. 19355650 &
             SBOT NO. 00795364
5            Cameron County Courthouse
             974 E. Harrison
6            Brownsville, TX  78520
             (956)  544-0849 Phone
7            (956)  544-0869 Fax

8    APPEARING FOR THE DEFENDANT:

9            HON. ALFREDO PADILLA
             Attorney At Law
10           SBOT NO. 15404600
             1000 E. Van Buren
11           Brownsville, TX  78520
             (956)  544-7100
12           (956)  544-0647 Fax

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        VOLUME 4

2            STATE'S MOTION TO REVOKE HEARING

3   MAY 10, 1999                              PAGE    VOL

4   STATE'S WITNESSES:
                                             VOIR
5   NAME                    DX   CX   RDX   RCX   DIRE    VOL

6   JOSE LUIS MATA          5                      10
    JOSE LUIS MATA               20   36    40
7   DEFENDANT'S BILL OF EXCEPTION NO. 1..............23     4

8   COURT'S RULING..................................41     4

9   Adjournment.....................................45     4

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**ALPHABETICAL WITNESS INDEX**

**STATE'S MOTION TO REVOKE HEARING**

| NAME | DX | CX | RDX | RCX | VOIR DIRE | VOL |
|------|-----|-----|-----|-----|-----------|-----|
| MATA, JOSE LUIS | 5 | | | | 10 | 4 |
| MATA, JOSE LUIS | | 20 | 36 | 40 | | 4 |

1

## INDEX OF EXHIBITS

2

### STATE'S MOTION TO REVOKE HEARING

STATE EXHIBITS:

3

| NO. | DESCRIPTION | OFFERED | RECEIVED | VOL |
|-----|-------------|---------|----------|-----|

4

| 2 | SEX OFFENDER | | | |
| | REGISTRATION FORM | 10 | 12 | 4 |
| 3 | FELONY DISP. SHEET | 10 | 12 | 4 |

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**VOLUME 4**

**P R O C E E D I N G S**

1
2
3          THE COURT:  You may proceed on the motion
4    to revoke, sir.
5          MR. PADILLA:  Based upon the Court's
6    ruling, and subject to the Court's ruling, I am.
7          THE COURT:  Yes, sir.  You may proceed,
8    1Mrs. Garcia.
9          MS. GARCIA:  The State calls Jose Luis
10   Mata to the stand.
11          THE COURT:  Mr. Mata, you were sworn in
12   last week, and you are still under oath.
13                **JOSE LUIS MATA,**
14     having been first duly sworn, testified as follows:
15                **DIRECT EXAMINATION**
16
17
18     Q.    Mr. Mata, where do you work?
19     A.    Excuse me?
20     Q.    Where do you work, Mr. Mata?
21     A.    I work for the Cameron County Adult Probation
22   Office.
23     Q.    How long have you worked for the Adult
24   Probation?
25     A.    I have worked for the Adult Probation since

```
1    July 6, 1992.

2         Q.    What is your position with the department?

3         A.    I am an adult probation officer.

4         Q.    I am going to call your attention to

5    96-CR-296-B.  Are you the supervision officer in this

6    cause number?

7         A.    Yes, I am.

8         Q.    Do you know who the defendant is?

9         A.    Yes, I do.

10        Q.    Who is the defendant?

11        A.    Edward LaFontaine.

12        Q.    And, did you have an opportunity to meet with

13   Mr. LaFontaine?

14        A.    Yes, I did.

15        Q.    When did you meet with Mr. LaFontaine?  First

16   of all let me ask you, is Mr.  LaFontaine in the

17   courtroom today?

18        A.    Yes, he is.

19        Q.    Would you please identify him by an article of

20   clothing he is wearing?

21        A.    He is wearing the orange jump suit.

22              THE COURT:  The record will reflect that

23   he has identified the defendant.

24              MS. GARCIA:  Thank you, Your Honor.

25   Q.    (BY MS. GARCIA)  You met with Mr. LaFontaine?
```

```
 1        A.    Yes, I did.
 2        Q.    And the defendant sitting here today is the
 3   same Edward LaFontaine that was placed on probation in
 4   96-CR-1627-B?
 5        A.    Yes, he is.
 6               MS. GARCIA:  At this point in time, Your
 7   Honor, the State requests that you take judicial notice
 8   of all documents on file, including the judgment, the
 9   conditions of probation, and the pre-sentence
10   investigation that was filed with this Court?
11               THE COURT:  The Court will take notice of
12   all documents on file.
13               MS. GARCIA:  Thank you.
14   Q.   (BY MS. GARCIA)  How many times did you meet with
15   Mr. LaFontaine?
16        A.    Once.
17        Q.    When you met with Mr. LaFontaine, did you go
18   over the rules and conditions of probation?
19        A.    Yes, I did.
20        Q.    You read him the rules?
21        A.    Yes.
22        Q.    Did the defendant have any questions?
23        A.    No, he did not.
24        Q.    Do you feel that he understood --
25               MR. PADILLA:  I object, Your Honor.
```

```
 1   That's -- that calls for speculation by the witness, Your
 2   Honor.
 3                THE COURT:  Just have him cover what he
 4   explained.  You may proceed.
 5                MS. GARCIA:  Thank you.
 6   Q.   (BY MS. GARCIA)  What rules and conditions did you
 7   go over when you met with Mr. LaFontaine.
 8                THE COURT:  You're not going to get into
 9   all of the rules and conditions, are you?
10                MS. GARCIA:  No, Your Honor.  Not all of
11   the rules.
12                THE COURT:  Just the ones that we are here
13   for today.
14                MS. GARCIA:  Yes, Your Honor.
15                THE WITNESS:  The basic rules on
16   probation:
17                To not get in trouble in this state, or in
18   any other state of the United States.
19                To report as directed;
20                To pay what he owes.
21   Q.   When you discussed the rules regarding
22   reporting, did you explain to him he had to report?
23   A.   Yes, I did.
24   Q.   And did you explain to him how he had to report
25   to your office?
```

8

1      A.    Yes, I did.

2      Q.    How did he have to report?

3      A.    He had to report on a weekly basis since he was

4  placed on intensive supervision.

5      Q.    Is that in person, or by mail?

6      A.    In person.

7      Q.    And did he have any questions when you

8  explained this condition to him?

9      A.    No, he did not.

10             MS. GARCIA:    May I approach the witness

11  Your Honor?

12             THE COURT:    Yes, ma'am.

13      Q.    (BY MS. GARCIA)    I am going to show you what

14  has been marked as State's Exhibit No. 2, and State's

15  Exhibit No. 3.  Do you recognize these documents?

16      A.    Yes, I do.

17      Q.    These documents are kept in the regular course

18  of business?

19      A.    Yes, they are.

20      Q.    And you are responsible for keeping these

21  documents?

22      A.    Yes, I am.

23      Q.    You are responsible for preparing these

24  documents?

25      A.    Yes, I am.

9

1          MS. GARCIA:  Mr. Padilla, I would like to

2    offer State's Exhibit No. 2 and No. 3.

3          MR. PADILLA:  May I take the witness on

4    voir dire?

5          THE COURT:  You may.

6                **VOIR DIRE EXAMINATION**

7

8    Q.   Mr. Mata, In reference to these documents do

9    you have any personal knowledge other than these two

10   documents concerning the meeting that you had with the

11   defendant in this case?

12   A.   Other than those two, no.

13   Q.   And were these documents, did he sign these

14   documents prior to you explaining it to him or after you

15   explained it to him?

16   A.   Excuse me?

17   Q.   Were these documents explained to him prior to

18   you explaining to him what the documents contained, or

19   after you explained it to him?

20   A.   After I explained it to him.

21   Q.   How long a meeting was this hearing conducted?

22   A.   Approximately, it takes about 15 to 20 minutes.

23   Q.   And where were these meetings conducted?

24   A.   This particular meeting was held in the county

25   jail.

```
 1        Q.    How long after the conviction, was it affected?

 2        A.    It was that same day.

 3        Q.    Shortly after the conviction?

 4        A.    Uhm -- maybe not right after the conviction;

 5  but that same day.

 6        Q.    And these documents, sir, they are kept by you,

 7  and they've been in your possession since it was signed

 8  by the defendant?

 9        A.    Yes, they have.

10        Q.    Were there any corrections, additions or

11  deletions made to this document after the defendant

12  signed it?

13        A.    Not at all.

14        Q.    Sir, where is the original, State's Exhibit

15  No. 2?

16        A.    The original is sent up to Austin.

17        Q.    And was that, to your knowledge, sent to

18  Austin?

19        A.    Yes, it was.

20        Q.    On what date?

21        A.    I don't recall the actual date but as soon as

22  that envelope is prepared, we sent it up.

23        Q.    Do you have any knowledge whether it was

24  received?  Did you receive any verification from it, when

25  it was received?
```

1        A.    No.   I sure didn't.

2                    MR. PADILLA:   I have no objections to it.

3                    THE COURT:   The exhibits will be admitted.

4                    **(State's Exhibit No. 2 & 3 admitted)**

5                    MR. PADILLA:   Thank you.

6        Q.    Could you please tell us what State's Exhibit

7    No. 2, and State's Exhibit No. 3 are.

8        A.    Number two is the sex offender registration

9    notification form, and State's Exhibit No. 3 is the

10   felony disposition sheet.

11       Q.    Was Mr. LaFontaine provided with a copy of

12   State's Exhibit No. 2 and State's Exhibit No. 3?

13       A.    State's Exhibit No. 3 -- on the felony

14   disposition sheet -- yes, he was.  On State's Exhibit

15   No. 2?  No, he wasn't.

16       Q.    On State's Exhibit No. 3 felony disposition

17   sheet, did -- did you review this sheet with Mr.

18   LaFontaine?

19       A.    Yes, I did.

20       Q.    When you reviewed this with Mr. LaFontaine what

21   did you explain to him?

22       A.    That -- that he wasn't supposed to get in

23   trouble, that he needed to report as directed which is

24   going to be on a weekly basis, that he couldn't leave

25   without permission from the county, and that he needed to

1    pay his court ordered fees.

2        Q.    And when you explained to him that he had to

3    report to you in person, in Cameron County, Texas, did he

4    ask any questions in reference to that?

5        A.    He asked when, you know, he needed to report.

6        Q.    And did you answer that question?

7        A.    Yes, I did, that he needed to reply -- and

8    report the following week.

9        Q.    After you explained to him that he could not

10   leave to Cameron County, Texas without permission did he

11   have any questions in regards to that condition?

12       A.    No, he did not.

13       Q.    Besides this document -- State's Exhibit

14   No. 3 -- that was provided to the defendant, did you

15   provide any other documentation to him?

16       A.    No.

17       Q.    Did he -- did Mr. LaFontaine report to you?

18       A.    No, he did not.

19       Q.    When did he fail to report, do you know?

20       A.    As soon as the following week started he just

21   didn't report.

22       Q.    And when would be the following week?

23       A.    The week after March 24 of '97.

24       Q.    Did he report in March 1997 as ordered by the

25   court?

13

```
 1        A.    No, he did not.

 2        Q.    How about in April of 1997, did he report?

 3        A.    No.

 4        Q.    In May of 1997, did he report to you?

 5        A.    No.

 6        Q.    In June of 1997, did he report to you?

 7        A.    No.

 8        Q.    In July of 1997, did he report?

 9        A.    No.

10        Q.    In August of 1997, did he report?

11        A.    No, he didn't.

12        Q.    And "he" would mean Mr. LaFontaine; is that

13  correct?

14        A.    Yes.

15        Q.    In September of 1997, did he report to you?

16        A.    No.

17        Q.    October of 1997, did the defendant report to

18  you?

19        A.    No.

20        Q.    In November of 1997, did the defendant report

21  to you?

22        A.    No.

23        Q.    In December of 1997, did he report to you?

24        A.    No.

25        Q.    In January of 1998, did he report to you?
```

14

1        A.    No.

2        Q.    How about in February of 1998, did the

3    defendant report?

4        A.    No.

5        Q.    March of 1998, did the defendant report?

6        A.    No.

7        Q.    Did the defendant ever request permission to

8    leave Cameron County, Texas?

9        A.    He was -- he didn't request; but in court, it

10   was ordered that he could transfer out.  But it was

11   explained to him that Interstate Compact needed to give

12   him permission to go to Missouri.

13       Q.    How was he to request permission to leave the

14   county?

15       A.    The Cameron County Adult Probation is the

16   agency that prepares the documents for him to be

17   transferred out of state.

18       Q.    Mr. Mata, my question now, is:  If Mr.

19   LaFontaine wanted to leave, could he have just asked you

20   or did he have to submit it in writing?

21       A.    He could just ask.

22       Q.    Did Mr. LaFontaine ever ask for permission to

23   leave Cameron County?

24       A.    He never asked me.  It was on the document on

25   the felony disposition sheets.

1       Q.   And when you met with him, and explained to him

2   the rules and conditions of his problems, did you tell

3   him that he needed to ask permission to leave, and

4   provide documentation?

5       A.   Yes.

6       Q.   Did Mr. LaFontaine ever ask permission to leave

7   Cameron County, Texas?

8       A.   I don't recall actually him saying it, but

9   since it was in the documents that we received in court,

10   we automatically started the documentations to send up to

11   Interstate Compac.

12       Q.   And he requested to go where, do you know?

13       A.   Missouri.

14       Q.   The state of Missouri?

15       A.   Yes.

16       Q.   But he didn't secure permission?

17       A.   No.

18       Q.   Because he never reported?

19       A.   He never reported.

20       Q.   So essentially he didn't have permission to

21   leave Cameron County, Texas?

22       A.   No.

23       Q.   "No," he did not have permission?

24       A.   No.  He did not have permission.

25       Q.   As a condition of probation, was he also

1    required to maintain suitable employment?

2        A.    Yes.

3        Q.    Did you explain this condition to him?

4        A.    Yes, I did.

5        Q.    Did he have any questions when you explained

6    this condition to him?

7        A.    He had a question regarding him staying in the

8    Port Isabel area, as I recall, to look for employment

9    while the transfer of paperwork was being accepted at

10   Interstate.

11       Q.    And if he found suitable employment was he

12   supposed to report this information to you?

13       A.    Yes, he was.

14       Q.    He was supposed to provide proof?

15       A.    Yes.

16       Q.    Did he ever provide proof that he was suitably

17   employed?

18       A.    No.

19       Q.    And that's because he never reported to you?

20       A.    Yes.

21       Q.    Was he also told that he had to attend alcohol

22   and drug abuse counseling classes?

23              MR. PADILLA:   I am going to object.   I

24   don't believe that that's part of the allegations of the

25   motion to revoke.

1     THE COURT:  Sustained.

2     MS. GARCIA:  Your Honor, in the State's

3 Third Amended Motion to Revoke that is one of the

4 allegations.  As you can see, it is Paragraph Eight, Your

5 Honor.

6     THE COURT:  Overruled.  It is overruled.

7 Mr. Padilla.  It's on the document.

8   Q. (BY MS. GARCIA)  Mr. Mata did you explain to

9 Mr. LaFontaine that he had to attend alcohol and drug

10 abuse counseling classes?

11   A. Yes.

12   Q. Did he have any questions when you explained

13 this condition to him?

14   A. No, none that I recall.

15   Q. Did he ever attend alcohol and drug abuse

16 counseling classes?

17   A. Not to my knowledge, no.

18   Q. And if he would have participated in these

19 programs, you would be receiving proof of it, correct?

20     MR. PADILLA:  I object, Your Honor.  First

21 and foremost, she is leading the witness.  Secondly, he

22 has already testified that he had nothing.  So, whatever

23 else might be -- or not have been -- would be purely

24 irrelevant.

25     THE COURT:  It will be sustained.

1          Q.    (BY MS. GARCIA)  Mr. Mata, did you inform the

2    defendant that he needed to participate in the sexual

3    offender's program?

4          A.    Yes.

5          Q.    When you explained this condition to him did he

6    have any questions?

7          A.    No.  None that I can think of.

8          Q.    Did the defendant participate in the sexual

9    assault programs?

10         A.    No.

11         Q.    Mr. Mata, do you know whether the defendant

12    left Cameron County, Texas?

13         A.    By actual proof of him physically leaving, no.

14    Only the phone calls that I received from Travis County.

15         Q.    So you were aware that he left Cameron County

16    Texas?

17         A.    Yes.

18         Q.    And, he did so without asking for permission

19    from the community supervision office?

20         A.    Yes.

21              MS. GARCIA:  I pass the witness, Your

22    Honor.

23              THE COURT:  Mr. Padilla.

24

25

### CROSS-EXAMINATION

1

2

3          MR. PADILLA:  Yes, Your Honor.

Q.   (BY MR. PADILLA)  Mr. Mata, other than the document

that you have identified previously, Exhibits 2 and 3 is

there any other documentation signed by the defendant in

your presence, sir?

A.    Ah, yes.  There is another document that I

don't have here, is the Gun Control Act.

Q.    Do you have the document with you?

A.    No.

Q.    That he signed?

A.    That I signed?

Q.    That he signed?

A.    I believe -- I think he did.  We always had it

as part of the packet, in the process.

Q.    How many people did you process on that day

when you were doing this process?

A.    I don't recall how many people that we

processed.

Q.    Was it one or more than one?

A.    I processed him alone; yes.

Q.    When you were processing him, how many people

did you process with him during that time?

A.    I don't know, sir.

1          Q.    Do you have audio or video tapes of the

2    conversations that you had with the defendant?

3          A.    No.

4          Q.    Other than your statement here that you

5    explained these documents to him before he signed them,

6    did you have any other evidence or proof that would

7    correlate that, sir, or corroborate that?

8          A.    Only his signature and my signature.

9          Q.    Okay.  But you can't tell the Court a lick of

10   the conversation and what was the actual specific

11   discussions, or any questions that might he have had?  Do

12   you have any personal notations in your file at ought

13   that who assist this Court in attempting to decide what

14   Mr. LaFontaine was explained, or not explained?

15         A.    No.  Only what we have on the felony

16   disposition sheets.

17         Q.    All right, sir.  Do you believe that the

18   offense that the defendant was charged, was a serious

19   offense?  In your opinion, did you believe, or do you

20   believe that the charges that the defendant was charged

21   with, was a serious offense?

22         A.    The actual assault offense?

23         Q.    Yes, sir.  You believe it was a serious

24   offense, do you not?  In relation to --

25         A.    In my opinion I have nothing to do with that.

Just do what I have to do, in my job.

Q.   Now, sir, the reason that I ask that, sir, is it your custom or your practice that you would spend more time explaining the conditions of probation with a person that is charged with sexual assault, than you would a person that has been charged with a burglary of a habitation?

A.   There are more documents to be signed by the sexual assault than a person who committed a burglary.

Q.   Where was the meeting that you had -- the meeting that you had with Mr. LaFontaine or Hauersperger?

A.   In Cameron County.

Q.   Were you and he alone?

A.   Well, there were other jailors around.

Q.   Were you in a room by yourselves?

A.   No.

Q.   Prior to you, sir, explaining these documents to you, did you advise him that -- that -- that for all practical purposes -- you know -- you are -- you are an agent of the state?

A.   Yes.

Q.   And did you tell him with reference to any discussions that he may have had with you, that you have the right to remain silent?

                MS. GARCIA:   Your Honor, I am going to

1  object.  This is an improper question, and he was not in

2  custody.

3              MR. PADILLA:  If he's a state agent, and

4  he is questioning him, or making any response, I think he

5  should be Mirandised.  I think I should be afforded the

6  chance to cross examine him on that.

7              THE COURT:  It will be sustained.

8              MR. PADILLA:  Your Honor, can I offer a

9  bill of exception?  Can I do it as bill of exception

10 number one.

11             THE COURT:  You may.

12             DEFENDANT'S BILL OF EXCEPTION NO. 1

13     Q.    (BY MR. PADILLA)  Okay, officer again, for all

14 practical purposes are you considered a law enforcement

15 officer, or not?

16     A.    No.

17     Q.    Are you considered a peace officer?

18     A.    No.

19     Q.    Are you employed by the state?

20     A.    Yes.

21     Q.    Are you employed by Cameron County?

22     A.    Yes.

23     Q.    As a result of that, do you closely work with

24 the state agencies monitoring defendants; is that

25 correct?

1     A.    Depending on what state agencies we are talking

2  about.

3     Q.    You represent the courts; do you not?

4     A.    Yes.

5     Q.    My question to you, is this:  Is there any

6  policy within the Cameron County Probation Department

7  that would require you, or requires you to Mirandise a

8  person before you interview him?

9     A.    No.

10     Q.    So, therefore, did you Mirandise

11  Mr. Hauersperger prior to interviewing him?

12     A.    No.

13     Q.    So, you never told him, he had the right to

14  remain silent?

15     A.    No.

16     Q.    So you never told him that anything he said at

17  that hearing would be used against him; is that correct?

18     A.    I don't understand what hearing you're talking

19  about.

20     Q.    Well, at the meeting that you had with the

21  defendant --

22           MR. PADILLA:  Your Honor, this is under

23  the bill of exception, unless -- and I'll let the State

24  know when I'm through with my bill of exceptions.

25           MS. GARCIA:  That's what I needed to know.

```
 1    I needed a clarification, if this was a bill of
 2    exception.
 3                   THE COURT:  It is.
 4    Q.   (BY MR. PADILLA)  Officer -- or probation
 5    officer -- so, you never notified him, that when he had a
 6    meeting with you, with Mr. Hauersperger, that he refused
 7    to answer any questions?
 8         A.   No.
 9         Q.   Did you advise him, furthermore, that anything
10    he told you at that meeting, with him, that you later on
11    could testify against him?
12         A.   No.
13         Q.   Did you prepare any type of card or any type of
14    documentation that would have indicated that he
15    understood he was waiving certain constitutional rights
16    by talking to you?
17         A.   No.
18                   MR. PADILLA:  Your Honor, I'm going to ask
19    just so that the record is clear that I ask that all the
20    testimony concerning what the defendant may have told
21    him -- this is under the bill of exception, but that it
22    be stricken because of the fact that the defendant was
23    not Mirandised, prior to being interviewed.
24                   THE COURT:  All right.  Your bill of
25    exception is noted.  I've made my previous ruling.
```

1          MR. PADILLA:  I would reurge that outside

2     the bill, that any testimony of this defendant any

3     testimony from this witness be kept aside.

4          THE COURT:  It will be overruled.

5          MR. PADILLA:  Thank you, Judge.  Back away

6     from the bill of exception.

7          Q.   (BY MR. PADILLA)  Officer, so when you

8     stated -- when is the last time that you had any contact

9     with Mr. Hauersperger?

10         A.   On March 24, 1997.

11         Q.   And when did you learn that he was in custody?

12         A.   That same day.

13         Q.   And when did you learn that he was in custody

14    after that?

15         A.   When I received a phone call from Travis

16    County.

17         Q.   And when was that?

18         A.   When?

19         Q.   Yes.

20         A.   That was some time during 1998.

21         Q.   Sir, does your -- does the document that you --

22    that you offers, number two, or number 3, does it

23    indicate there on the address the location, the time, and

24    the place where the defendant is to report to you?

25         A.   It doesn't have the actual -- it has the

1   address.  But it doesn't say the actual time.

2       Q.   Does it -- okay.  But -- is there anything

3   written on the document itself that states that you are

4   to report, whatever, 964 East Harrison, Brownsville,

5   Cameron County, Texas, at Tuesday, 10 a.m. or every

6   Monday 10 a.m?  Nothing of that nature?

7       A.   No.

8       Q.   Is there anything in your documents that would

9   indicate to you, sir, that the defendant was advised to

10  abstain from -- excuse me -- to attend alcohol and drug

11  abuse counseling?

12      A.   The actual document that we signed, that he

13  signed and I signed does stipulated that he is to abstain

14  from alcohol and to attend counseling.

15      Q.   Does the document show to where he is supposed

16  to obtain o counseling?

17      A.   No.

18      Q.   Does he tell you how often he is supposed to

19  obtain drug counseling?

20      A.   No.  That's until he reports.

21      Q.   Does it tell you who he is to report to for the

22  purposes of attending the drug and alcohol counseling?

23      A.   No.

24      Q.   Do you have any information, or knowledge, sir,

25  or personal knowledge that the defendant knew where he

1    was supposed to report, to whom he was supposed to

2    report, to and when he was supposed to report for drug

3    counseling?

4         A.   No.

5         Q.   Sir, when you stated that the defendant has

6    failed to participate in the drug offenders program as

7    provided by the court, is there anything in the document,

8    anything in the documents that the offense the sexual

9    offender program?

10        A.   Yes.

11        Q.   Does it even advise any document that you

12   provided the defendant, actually advise him of what the

13   conditions are?  Did you give him any conditions at all?

14        A.   Conditions of probation, yes.

15        Q.   Yeah, but under sexual offender programs?

16        A.   No.

17        Q.   So all you are telling us is the defendant did

18   participate in the sexual offender program and that's the

19   extent of it?

20        A.   And the copy that we provided him; the

21   disposition.

22        Q.   And just so the record is clear, what does the

23   sexual offender program normally entail; what does it

24   cover?  What do you have to do?

25        A.   Basically, it covers, is, that they have to

1  participate on a specialized case load, sex offender case

2  load.  They have to register with local, law enforcement,

3  within seven days.

4      Q.    Did you advise him, sir, that he had to

5  register within seven days of the offense?

6      A.    Yes.  I did.

7      Q.    Where is that in your document?

8      A.    There is none documented; only that he has to

9  participate in the program.

10     Q.    And --

11     A.    And the signature on the actual sex offender

12 registration notification.

13     Q.    Sir, in your opinion, how many sexual offender

14 probationers do you believe you have had since your

15 employment in 1992?

16     A.    Approximately, no more than seventy.

17     Q.    Is it your opinion that when persons are

18 convicted, that they are familiar with what the sexual

19 offender program is?

20     A.    Before explanation?  No.

21     Q.    Sir, you testified earlier that you had not

22 advised him where he was supposed to report, so,

23 therefore, did you attempt to contact him at any time,

24 after May of 1997?  Did you attempt to contact him?

25     A.    To report?

1    Q.    Yes.

2    A.    To report.  You were asking about reporting for

3    the alcohol and drug counseling.

4    Q.    Well, let's go back to the regular reporting.

5    I understand you've alleged that he failed to report in

6    May of 1997, is that correct?

7    A.    Yes.

8    Q.    My question to you is this:  Did you make any

9    efforts at that time, to locate the whereabouts of the

10   defendant, to advise him, where he was supposed to

11   report, how he was supposed to report and when he was

12   supposed to report?

13   A.    Just by phone call.

14   Q.    You called him?

15   A.    The reference number to his mother, Nancy

16   LaFontaine.

17   Q.    And did you have an opportunity to speak to Mr.

18   LaFontaine?

19   A.    No.

20   Q.    Did you leave any message to Ms. LaFontaine

21   advising him -- advising her, excuse me, to advise

22   Mr. LaFontaine that he needed to comply with the

23   conditions of reporting, what the conditions were, when

24   he was supposed to report, where he was supposed to

25   report, and how he was supposed to report?

1    A.    Yes.

2    Q.    And when did you say you spoke to her?

3    A.    I don't remember.  It was after he didn't

4  report to our office.  So I made that phone call.

5    Q.    Do you have a notation in your file, can you

6  please look in your file and tell me what date you talked

7  to them or talked to his mother.

8    A.    I don't have the actual note with me.

9    Q.    Well, sir, is it a practice of the probation

10  department that when you work on a file you make entries

11  in your file, or is it left to your recollection for a

12  later date?

13    A.    We make entries in our file.

14    Q.    And your testimony here today, is, that you

15  have no entries in your file alleging the conversation

16  that you had with Mrs. LaFontaine?

17    A.    In our file, it is not actually on our paper

18  but we have it documented on the computer.

19    Q.    Okay, sir.  Well, do you make notation in your

20  file, or do you make notations in your computer?

21    A.    In our computer.

22    Q.    Sir, whether the Defendant has worked in

23  suitable employment or not, you have no personal

24  knowledge; isn't that correct?

25    A.    Yes.  I don't have knowledge.

1      Q.   Okay.  Sir, when you testified that he has

2   failed to keep suitable employment, you are presuming

3   that he has not had suitable employment; is that correct?

4      A.   That's correct.

5      Q.   Suitable employment.  Who else, sir, besides

6   you at your office, can give consent to a probationer to

7   travel outside of the county?

8      A.   Other than the officer?  Probably the

9   supervisor.

10      Q.   Can any other probation officer of the same

11   status as you, give permission to the probationer to

12   travel, or not?

13      A.    If the officer in charge is not there, usually

14   the duty officer will ask the supervisor.

15      Q.   Sir, what kind of written consent form does

16   your office maintain for the purposes of allowing

17   somebody to travel?

18      A.   Travel permits.

19      Q.   And when you spoke to Mr. LaFontaine, when he

20   signed the one page document, and the second page, was he

21   provided the means, the times, and the dates and the

22   procedures for implementing consent to travel?

23      A.   No.  Because he was advised that he couldn't

24   leave.

25      Q.   Okay.  So therefore, what you're telling me,

32

1   then, is, he was never provided any impetus from your

2   office, if he needed to travel how he could travel?

3       A.   It's on the felony disposition sheet, that --

4   if he wants to travel he needs no request permission.

5       Q.   Yes, sir.  But my question to you, is this:

6   Did you ever sit him down and say, look if you ever want

7   to travel, you have to come to my office.  You have to

8   set an office appointment with me, you have to come in

9   here, you have to show good grounds to travel, and I am

10  going to give you a written permit to travel.  Did you

11  ever tell him that?

12      A.   That's basically the way we advise before they

13  leave.

14      Q.   That's basically the way you advise, my

15  question to you is this, do you have any personal

16  recollection how you did it in this case?

17      A.   We always do it in all cases.

18      Q.   The question is:  "Yes," you did do it in this

19  case?

20      A.   Yes, I did.

21      Q.   Sir, did you make any effort to communicate

22  with Mr. Hauersperger once he was the detained at the

23  Travis County Jail?

24      A.   No.

25      Q.   You never spoke to him to ascertain whether --

1  or to verify your alleged violation of the probation

2  order?

3      A.   No.

4      Q.   Sir, did you ever have an opportunity to

5  provide the Defendant a copy of his probation judgment?

6      A.   No.  Because he never reported.

7      Q.   And, is it standard practice within the Cameron

8  County Probation Office Department, to provide the

9  Defendant with a probation judgment?

10     A.   Yes, it is.

11     Q.   And what is it -- what is in the probation

12 judgment, sir?

13     A.   All of the conditions and rules of the court,

14 of probation.

15     Q.   As a matter of fact, isn't it true that after

16 you read a probation judgment to a probationer, you also

17 fingerprint him; do you not?

18     A.   No.

19     Q.   You never fingerprinted him?

20     A.   Not after we give him the judgment.  When we

21 read the disposition sheet, yes, we do.

22     Q.   Okay.  But, am I correct, sir, to assume that

23 the probation judgment is the judgment that you attempt

24 to enforce and not the disposition sheet; isn't that

25 correct?

1    A.    It's both.

2    Q.    Okay.  Well, what is -- if you -- if you read

3  the probationer a felony disposition sheet what is the

4  purpose of having them sign or having received a copy of

5  the probation judgment?

6    A.    The judgment is for them to keep, and they sign

7  it one day, once they go into the office, for them to

8  keep.

9    Q.    Would I assume, sir, that your policy is, to

10  make sure that he understands what's in the judgment, and

11  what's not in the judgment; isn't that correct?

12    A.    Yes.  That's correct.

13    Q.    But again, your record reflects that

14  Mr. Hauersperger never received a copy of his probation

15  judgment; is that correct?

16    A.    That's correct.

17    Q.    Officer, are you familiar with the conditions

18  that the Court placed literally on the defendant to be --

19  to move out of Cameron County?

20    A.    It's in the disposition sheet.

21    Q.    And was that something that you instructed the

22  defendant, that it was part of the Court's ruling, that

23  he leave Cameron County?

24    A.    Yes.

25    Q.    Sir, do you remember telling the defendant,

1    Mr. Hauersperger that the Court could not do that?

2        A.    No.

3                MR. PADILLA:  I pass the witness Your

4    Honor.

5                MS. GARCIA:  Your Honor, just a few

6    questions; I will be brief.

7                THE COURT:  You may proceed.

8                MS. GARCIA:  Thank you, Your Honor.

9                    **REDIRECT EXAMINATION**

10

11       Q.    (BY MS. GARCIA)  Mr. Mata, you are the

12   supervision officer for Edward LaFontaine, a/k/a Edward

13   Kent Hauersperger?

14       A.    Yes.

15       Q.    Mr. Mata, did you explain to the defendant that

16   he had to provide for 450 hours of community service

17   within the first two years of community supervision?

18       A.    Yes.

19       Q.    And is that in the felony disposition sheets,

20   State's Exhibit No. 3?

21       A.    Yes, it is.

22       Q.    Did he perform the 450 hours of community

23   supervision within the first two years of the community

24   supervision period?

25       A.    No, he did not.

1     MR. PADILLA:  Your Honor, I am going to

2  object.  May I have a -- Judge?  I believe that this is

3  re-direct.  I mean, I don't think that we covered any

4  aspect of the community supervisory hours on cross.  I

5  object.

6     THE COURT:  Overruled.  You may proceed.

7  Q.  (BY MS. GARCIA)  Mr. Mata, when you first met with

8  Mr. LaFontaine, did you give him a date and time that he

9  must report to you?

10     A.  Yes, I did.

11     Q.  Did he ask you -- again, to confirm, I need to

12  report on this date and this time.  Did he ask you,

13  again, when, and what time?

14     MR. PADILLA:  Can I have a running

15  objection?  Whatever the defendant may have said is a

16  violation of his constitutional rights to remain silent.

17     THE COURT:  You will have a running

18  objection.  It will be overruled.  Go ahead.

19     Q.  (BY MS. GARCIA)  Mr. Mata, do you feel that he

20  understood?

21     A.  Yes, I did.

22     MR. PADILLA:  That's speculative.  I

23  object, Your Honor.  That's speculative by this witness.

24     THE COURT:  The objection is so noted, and

25  overruled.

37

1  Q.   (BY MS. GARCIA)   Mr. Mata, did Mr. LaFontaine

2  provide you with an address or telephone number where he

3  could be contacted?

4      A.   Only the reference numbers that were left from

5  his home, with his mother.

6      Q.   And after he failed to report, did you contact

7  those numbers or call those numbers?

8      A.   Yes, I did.

9      Q.   Did you explain to Mr. LaFontaine that it was

10 his responsibility to report to you?

11     A.   Yes, I did.

12     Q.   Is it your responsibility to go looking for --

13 Mr. LaFontaine?

14     A.   Yes, it is.

15     Q.   And you did so?

16     A.   By the phone calls, yes.

17     Q.   And, who did you speak to, do you recall?

18     A.   To Nancy LaFontaine.

19     Q.   Who is Ms. LaFontaine?

20     A.   Mr. LaFontaine's mother.

21     Q.   Did you explain to Mr. LaFontaine that a

22 judgment would be provided to him, once it was prepared?

23     A.   Yes, I did.

24     Q.   That is noted in the felony disposition sheet;

25 is that correct?

1      A.    It -- the actual terms that say that he is
2  going to get a judgment?
3      Q.    Yes.
4      A.    No.
5      Q.    Okay.
6              MS. GARCIA:   May I approach the witness,
7  Your Honor?
8              THE COURT:   You may.
9      Q.    The conditions of probation, does it state that
10  a certified copy of the probation judgment will be issued
11  at a later date?
12     A.    Oh, that's correct.
13     Q.    And this was explained to Mr. LaFontaine?  Or
14  this was read to Mr. LaFontaine?
15     A.    It was read to Mr. LaFontaine.
16     Q.    And he signed this document?
17     A.    Yes, he did.
18     Q.    State's Exhibit No. 3, felony disposition
19  sheet; is that correct?
20     A.    Yes.
21     Q.    And you also signed it?
22     A.    Yes.
23              MS. GARCIA:   I have no further questions
24  of this witness, Your Honor.
25              THE COURT:   Anything else, Mr. Padilla?